This is not the official court record. Official records of court proceedings may only be obtained directly from the court maintaining a particular record.

## Midstate Financial Corporation, Hendricks County Bank and Trust Company v. Fidelity and Deposit Company of Maryland

| | |
|---|---|
| Case Number | 32D02-2012-PL-000169 |
| Court | Hendricks Superior Court 2 |
| Type | PL - Civil Plenary |
| Filed | 12/23/2020 |
| Status | 12/23/2020 , Pending  (active) |

## Parties to the Case

Defendant   Fidelity and Deposit Company of Maryland

Address
4 WORLD TRADE CENTER, 54TH FLOOR
150 GREENWICH STREET
NEW YORK, NY 10007

Plaintiff      Midstate Financial Corporation

Address
c/o ICE MILLER LLP
Suite 2900
Indianapolis, IN 46282-0200

Attorney
Samuel Benton Gardner
*#3282529, Lead, Retained*

One American Square
Suite 2900
Indianapolis, IN 46282
(317) 236-2232(W)

Attorney
Nicholas B Reuhs
*#3118149, Retained*

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282
317-236-5942(W)

Plaintiff      Hendricks County Bank and Trust Company

<u>Address</u>
c/o ICE MILLER LLP
Suite 2900
Indianapolis, IN 46282-0200

<u>Attorney</u>
Nicholas B Reuhs
*#3118149, Lead, Retained*

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282
317-236-5942(W)

<u>Attorney</u>
Samuel Benton Gardner
*#3282529, Retained*

One American Square
Suite 2900
Indianapolis, IN 46282
(317) 236-2232(W)

## Chronological Case Summary

| | |
|---|---|
| 12/23/2020 | **Case Opened as a New Filing** |

| 12/28/2020 | **Appearance Filed** |
|---|---|

Appearance-Samuel B. Gardner

| For Party: | Midstate Financial Corporation |
|---|---|
| For Party: | Hendricks County Bank and Trust Company |
| File Stamp: | 12/23/2020 |

| 12/28/2020 | **Complaint/Equivalent Pleading Filed** |
|---|---|

Complaint for Declaratory Relief and Bad Faith

| Filed By: | Midstate Financial Corporation |
|---|---|
| Filed By: | Hendricks County Bank and Trust Company |
| File Stamp: | 12/23/2020 |

| 12/28/2020 | **Subpoena/Summons Filed** |
|---|---|

Summons-FIDELITY AND DEPOSIT(New York, NY)

| Filed By: | Midstate Financial Corporation |
|---|---|
| Filed By: | Hendricks County Bank and Trust Company |
| File Stamp: | 12/23/2020 |

| 12/28/2020 | **Subpoena/Summons Filed** |
|---|---|

Summons-FIDELITY AND DEPOSIT(Registered Agent)

| Filed By: | Midstate Financial Corporation |
|---|---|
| Filed By: | Hendricks County Bank and Trust Company |
| File Stamp: | 12/23/2020 |

## Financial Information

\* Financial Balances reflected are current representations of transactions processed by the Clerk's Office. Please note that any balance due does not reflect interest that has accrued – if applicable – since the last payment. For questions/concerns regarding balances shown, please contact the Clerk's Office.

**Midstate Financial Corporation**

Plaintiff

## Balance Due (as of 02/19/2021)

**0.00**

### Charge Summary

| Description | Amount | Credit | Payment |
|---|---|---|---|
| Court Costs and Filing Fees | 157.00 | 0.00 | 157.00 |

### Transaction Summary

| Date | Description | Amount |
|---|---|---|
| 12/28/2020 | Transaction Assessment | 157.00 |
| 12/28/2020 | Electronic Payment | (157.00) |

| |
|---|
| This is not the official court record. Official records of court proceedings may only be obtained directly from the court maintaining a particular record. |

STATE OF INDIANA     )
             ) SS:
COUNTY OF HENDRICKS )

IN THE HENDRICKS _____ COURT

CAUSE NO. _____

| | |
|---|---|
| MIDSTATE FINANCIAL CORPORATION and HENDRICKS COUNTY BANK AND TRUST COMPANY, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | ) ) ) |
| Defendant. | ) |

## E-FILING APPEARANCE BY ATTORNEYS IN CIVIL CASE

**This Appearance Form must be filed on behalf of every party in a civil case.**

1. The party on whose behalf this form is being filed is:
   Initiating __**X**__ Responding _____ Intervening _____; and the undersigned
   attorney and all attorneys listed on this form now appear in this case for the following parties:

   Name of parties: __**Midstate Financial Corporation; Hendricks County Bank and Trust Company**__
   Address of party *(see Question # 5 below if this case involves a protection from abuse order, a workplace violence restraining order, or a no-contact order)*

   _____
   _____

2. Attorney information for service as required by Trial Rule 5(B)(2):

   Nicholas B. Reuhs, Attorney No. 31181-49
   ICE MILLER LLP
   One American Square
   Suite 2900
   Indianapolis, IN  46282-0200
   (317) 236-2160 (telephone)
   (317) 592-4378 (facsimile)
   Nicholas.Reuhs@icemiller.com

Samuel B. Gardner, Attorney No. 32825-29
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2234 (telephone)
(317) 592-4878 (facsimile)
Samuel.Gardner@icemiller.com

**IMPORTANT**:  Each attorney specified on this appearance:
(a) certifies that the contact information listed for him/her on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date of this Appearance;
(b) **acknowledges that all orders, opinions, and notices from the Court in this matter that are served under Trial Rule 86(G) will be sent to the attorney at the e-mail address(es) specified by the attorney on the Roll of Attorneys regardless of the contact information listed above for the attorney**; and
(c) understands that he/she is solely responsible for keeping his/her Roll of Attorneys contact information current and accurate, see Ind. Admis. Disc. R. 2(A).
Attorneys can review and update their Roll of Attorneys contact information on the Courts Portal at http://portal.courts.in.gov.

3.  This is a ____PL____ case type as defined in administrative Rule 8(B)(3).

4.  This case involves child support issues. Yes _____ No __X__ *(If yes, supply social security numbers for all family members on a separately attached document filed as confidential information on **light green paper**. Use Form TCM-TR3.1-4.)*

5.  This case involves a protection from abuse order, a workplace violence restraining order, or a no-contact order. Yes _____ No __X__ *(If Yes, the initiating party must provide an address for the purpose of legal service but that address should not be one that exposes the whereabouts of a petitioner.)*  The party shall use the following address for purposes of legal service:
    _____  Attorney's address
    _____  The Attorney General Confidentiality program address
             (contact the Attorney General at 1-800-321-1907 or e-mail address is
             **confidential@atg.in.gov)**
    _____  Another address (provide)

    This case involves a petition for involuntary commitment.  Yes _____ No __X__

6.  If Yes above, provide the following regarding the individual subject to the petition for involuntary commitment:

    a.  Name of the individual subject to the petition for involuntary commitment if it is not already provided in #1 above:

    b.  State of Residence of person subject to petition: _____

- 2 -

 c. At least one of the following pieces of identifying information:

  (i) Date of Birth _____

  (ii) Driver's License Number _____

   State where issued _____ Expiration date _____

  (iii) State ID number _____

   State where issued _____ Expiration date _____

  (iv) FBI number _____

  (v) Indiana Department of Corrections Number _____

  (vi) Social Security Number is available and is being provided in an attached confidential
   document Yes _____ No _____

7. There are related cases: Yes_____ No **X**

8. Additional information required by local rule: _____

9. There are other party members: Yes _____ No **X** *(If yes, list on continuation page.)*

10. This form has been served on all other parties and Certificate of Service is attached:
 Yes___ No **X**

      Respectfully submitted,

      */s/ Samuel B. Gardner*
      Nicholas B. Reuhs, Atty. No. 31181-49
      Samuel B. Gardner, Att. No. 32825-29
      ICE MILLER LLP
      One American Square, Suite 2900
      Indianapolis, IN  46282-0200
      (317) 236-2300

      Attorneys for Plaintiffs
      Midstate Financial Corporation and Hendricks
      County Bank and Trust Company

I\15876859.1

Case 1:21-cv-00430-TWP-DLP   Document 1-2   Filed 02/24/21   Page 7 of 66 PageID #: 14
32D02-2012-PL-000169
Hendricks Superior Court 2

Filed: 12/23/2020 3:55 PM
Clerk
Hendricks County, Indiana

STATE OF INDIANA     )
                ) SS:
COUNTY OF HENDRICKS )

IN THE HENDRICKS _____ COURT

CAUSE NO. _____

MIDSTATE FINANCIAL CORPORATION and  )
HENDRICKS COUNTY BANK AND TRUST  )
COMPANY,                   )
                         )
          Plaintiffs,      )
                         )
   v.                     )
                         )
FIDELITY AND DEPOSIT COMPANY    )
OF MARYLAND,            )
                         )
          Defendant.     )

## COMPLAINT FOR DECLARATORY RELIEF AND BAD FAITH

Plaintiffs Midstate Financial Corporation and Hendricks County Bank and Trust Company (collectively, "Hendricks County Bank"), by counsel and for their Complaint against Defendant Fidelity and Deposit Company of Maryland ("Zurich"), state as follows:

### *Introduction*

1.    In June 2020, Hendricks County Bank was the target of a computer fraud attack. As a result of the incident, Hendricks County Bank suffered approximately $1,677,747 in losses. Prior to the incident, Zurich issued Henricks County Bank a Financial Institution Select Bond (the "Policy"), which insured Hendricks County Bank against the precise type of losses that it suffered.

2.    The above notwithstanding, Zurich has refused to pay Hendricks County Bank the total amount owed under the Policy. Moreover, in an apparent attempt to deter Hendricks County Bank from seeking the amount owed under the Policy, Zurich has knowingly misrepresented the scope of coverage available under its Policy and the relevant case law.

3.      As a result, Hendricks County Bank has been forced to file this suit, seeking a declaration from the Court stating that Zurich is required to provide coverage under the "Computer Systems Fraud" coverage part of the Policy, up to the $1,000,000 limit of that coverage part.

4.      Furthermore, Hendricks County Bank seeks to recover the damages it has incurred as a result of Zurich's bad faith.

### *Parties*

5.      Plaintiff Midstate Financial Corporation is an Indiana corporation with its principal place of business in Hendricks County, Indiana.

6.      Plaintiff Hendricks County Bank and Trust Company is an Indiana company with its principal place of business in Hendricks County, Indiana.

7.      Midstate Financial Corporation is a bank holding company and the parent of Hendricks County Bank and Trust Company.

8.      Zurich is an insurance company organized and existing under the laws of the State of Maryland with its principal place of business in the State of Illinois.

9.      Pursuant to the Indiana Trial Rules, this Court has personal and subject matter jurisdiction over Zurich and this case.

10.     Venue is appropriate in this Court pursuant to Indiana Trial Rule 75.

### *Factual Background*

#### The Incident

11.     On or around June 12, 2020, an unknown fraudster began implementing a fraudulent wire transfer scheme relating to Hendricks County Bank (the "Incident").

12.     As part of the scheme, the fraudster fraudulently entered and/or changed electronic data/programs within a computer system operated by Hendricks County Bank.

13.     The fraudulent entry and/or change caused property (specifically, money) to be transferred, paid, or delivered and/or an account of Hendricks County Bank, or of its customer, to be debited.

14.     Hendricks County Bank incurred $1,677,747.94 in losses as a direct result of the Incident.

The Policy

15.     Zurich issued Hendricks County Bank a Financial Institution Bond, Bond No. FIB 0002690 12 (defined above as the "Policy").   A true and accurate copy of the Policy is attached hereto, and incorporated herein, as ***Exhibit A***.

16.     The Policy is effective from January 1, 2018 through January 1, 2021.

17.     The Policy contains a "Computer Systems Fraud" coverage part, which provides certain first-party coverage to Hendricks County Bank.

18.     Specifically, in the "Computer Systems Fraud" coverage part, Zurich agreed to "indemnify the Insured [Hendricks County Bank] for … Loss resulting directly from a fraudulent (1) entry of electronic data or computer program into; or (2) change of electronic data or computer program within any **computer system** operated by the Insured … provided that the entry or change causes … (a) **property** to be transferred, paid or delivered; or (b) an account of the Insured, or of its customer, to be added, deleted, debited or credited[.]" (emphases in the original).

19.     The "Computer Systems Fraud" coverage part has a single loss limit of liability of $1,000,000, which is subject to a single loss deductible of $25,000.

***Zurich's Coverage Position and Claims-Handling***

The Denial

20.     After realizing that it had suffered a loss as a result of the Incident, Hendricks County Bank sought coverage under the Policy from Zurich (the "Claim").

- 3 -

21.     Hendricks County Bank requested coverage under the applicable "Computer Systems Fraud" coverage part.  Although the coverage available under the "Computer Systems Fraud" coverage part is not enough to make Hendricks County Bank whole, as noted above, the "Computer Systems Fraud" coverage part has a limit of $1,000,000.

22.     The "Computer Systems Fraud" coverage part unequivocally applies to the Incident.  Zurich, however, has continually refused to provide any coverage to Hendricks County Bank under the "Computer Systems Fraud" coverage part.  Instead, Zurich has only agreed to provide coverage to another coverage part that has a limit of $300,000.

23.     Through its coverage position, Zurich has breached its obligations under the Policy and denied Hendricks County Bank the bargained-for benefit of the Policy.

<u>The Bad Faith Claims-Handling</u>

24.     In dealing with Hendricks County Bank, Zurich has also attempted to induce Hendricks County Bank to drop and/or reduce its Claim by knowingly making misrepresentations about the Policy and applicable law.

25.     By way of example, in its November 25, 2020 letter to Hendricks County Bank, Zurich cited, as controlling case law, a decision that had been specifically vacated by the Indiana Supreme Court.

26.     In the same letter, attempting to distinguish the holding of a seminal case (*Medidata*) requiring coverage for this claim, Zurich intentionally misrepresented the facts underlying the case.  For instance, in its letter, Zurich contends "[i]f the policy [in the *Medidata* case]  contained any express direct loss requirement, the court did not mention it."  In reality, the court in *Medidata* expressly explained that the policy at issue contained a "direct loss" requirement.

27.     In short, Zurich has refused to provide any coverage under the "Computer Systems Fraud" coverage part and has misrepresented the relevant case law in attempting to pressure Hendricks County Bank to abandon its full Claim.

### *Request for Declaratory Relief*

28.     Hendricks County Bank repeats, realleges, and incorporates all preceding paragraphs as if fully set forth herein.

29.     The "Computer Systems Fraud" coverage part of the Policy requires Zurich to provide coverage to Hendricks County Bank for the losses which Hendricks County Bank sustained in connection with the Incident, up to the $1,000,000 limit of the "Computer Systems Fraud" coverage part.

30.     Zurich has repeatedly refused to provide any coverage to Hendricks County Bank under the "Computer Systems Fraud" coverage part of the Policy.

31.     The parties disagree about their respective rights and obligations under the "Computer Systems Fraud" coverage part of the Policy, and a justiciable controversy exists between Hendricks County Bank and Zurich regarding those rights and obligations.

32.     Hendricks County Bank seeks a declaration from the Court stating that Zurich is required to provide coverage for the damages that Hendricks County Bank incurred as a result of the Incident, up to the $1,000,000 limit of the "Computer Systems Fraud" coverage part.

### *Bad Faith*

33.     Hendricks County Bank repeats, realleges, and incorporates all preceding paragraphs as if fully set forth herein.

34.     Through its claims handling, claims settlement practices, and wrongful denial of full coverage to Hendricks County Bank, Zurich has: (a) refused to pay amounts owed under the Policy; (b) attempted to deceive its insured, Hendricks County Bank; and (c) used

misrepresentation and other unfair tactics to pressure its insured into the inequitable resolution of its Claim.

35.     In doing so, Zurich has acted with dishonest purpose, moral obliquity, furtive design, and ill will, thereby breaching its duties of good faith and fair dealing.

36.     As a result, Hendricks County Bank has been (and continues to be) damaged and is entitled to both compensatory and punitive damages.

WHEREFORE, Hendricks County Bank, by counsel, prays for:  (1) a declaratory judgment stating that Zurich is required to provide coverage for the damages that Hendricks County Bank has incurred as a result of the Incident, up to the $1,000,000 limit of the "Computer Systems Fraud" coverage part; (2) a judgment in its favor and against Zurich in an amount that will fully compensate Hendricks County Bank for its damages and losses resulting from Zurich's breach of its duties of good faith and fair dealing, including consequential and incidental damages and prejudgment interest; (3) an award of punitive damages; (4) an award of costs, attorney fees, and litigation expenses in this action, with interest; and (5) all other just and proper relief.

Respectfully submitted,


/s/  Nicholas B. Reuhs
Nicholas B. Reuhs, Attorney No. 31181-49
Samuel B. Gardner, Attorney No. 32825-29
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100
Nicholas.Reuhs@icemiller.com
Samuel.Gardner@icemiller.com

Attorneys for Plaintiffs
Midstate Financial Corporation and Hendricks
County Bank and Trust Company

## REQUEST FOR JURY TRIAL

Plaintiffs Midstate Financial Corporation and Hendricks County Bank and Trust Company

respectfully request that all issues herein properly triable by jury be so tried.

/s/  Nicholas B. Reuhs
Nicholas B. Reuhs
Samuel B. Gardner
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200

I\15843986

# EXHIBIT A

# Disclosure Statement



It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.



# Disclosure Statement

**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.



# Important Notice – In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President                                                    Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?**  Your agent or broker is best equipped to provide information about your insurance.  Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois  60196-1056
**1-800-382-2150** (Business Hours:  8am - 4pm [CT])
**Email**: info.source@zurichna.com

---

# Financial Institution Select Bond
**Declarations**



Administrative Office
1299 Zurich Way
Schaumburg, IL 60196
Bond No.: FIB 0002690 12

| This bond issued by | ☒ | Fidelity and Deposit Company of Maryland | ☐ | Colonial American Casualty and Surety Company |

(stock insurance companies, herein called Underwriter)

**Item 1.**  Name of Insured (herein called Insured):
Midstate Financial Corporation
Hendricks County Bank and Trust Company

Principal Address:
One East Main Street
Brownsburg, IN 46112
USA

---

**Item 2.**  Bond Period: From 12:01 a.m. on ___1/1/2018___ to 12:01 a.m. on ___1/1/2021___
                                                    (month, day, year)                          (month, day, year)
standard time at the principal address of the Insured listed above.

---

**Item 3.**  The Aggregate Liability of the Underwriter during the Bond Period shall
be $ 8,000,000

---

**Item 4.**  The Single Loss Limit of Liability and Single Loss Deductible for each Insuring Agreement or Coverage as shown in the Table of Limits of Liability and Deductible Amounts are subject to the Declarations, General Agreements and Conditions and Limitations of this bond and the terms and limitations of the Insuring Agreement of Coverage having reference thereto and any of its riders.

No coverage is provided under any Insuring Agreement or Coverage unless so indicated in the Table of Limits of Liability and Deductible Amounts showing the Underwriter's Limit of Liability or in any rider hereafter agreed upon.

---

**Item 5.**  The liability of the Underwriter is subject to the following riders attached hereto:
See Rider/Endorsment Index

---

U-FIB-D-0005-A CW  (01/01)
Page 1 of 2

**Item 6.**    All notices required to be given to the Underwriter shall be addressed to:
4 World Trade Center, 54th Floor
150 Greenwich Street
New York, NY 10007

**Item 7.**    The Insured, by acceptance of this bond, gives notice to the Underwriter terminating or
canceling prior bond(s) or policy(ies) No.(s)   FIB 0002690-11                              ,
such termination or cancellation to be effective as of the time this bond becomes effective.


By: _____
Authorized Representative

# Table of Limits of Liability And Deductible Amounts



To be attached to Bond No.: ___FIB 0002690 12___

| | | Insuring Agreement or Coverage | Single Loss Limit of Liability | Single Loss Deductible |
|---|---|---|---|---|
| (A) | | Fidelity | $4,000,000 | $25,000 |
| | | Trading Coverage | $4,000,000 | $25,000 |
| (B) | | On Premises | $4,000,000 | $25,000 |
| (C) | | In Transit/Cash Letter | $4,000,000 | $25,000 |
| (D) | | Unauthorized Signature or Alteration | $300,000 | $25,000 |
| (E) | | Securities | $500,000 | $25,000 |
| (F) | | Counterfeit Currency | $4,000,000 | $25,000 |
| (G) | | Audit and Claims Expense | $5,000 | N/A |
| (H) | | Automated Teller Machines | $30,000 | $2,500 |
| (I) | | Fraudulent Mortgages | Not Covered | N/A |
| (J) | | Servicing Contractors | Not Covered | N/A |
| (K) | | Check Kiting Fraud | $250,000 | $25,000 |
| (L) | | Computer Systems Fraud | $1,000,000 | $25,000 |
| (M) | | Data Processing Service Operations | Not Covered | N/A |
| (N) | | Voice Initiated Transfer Fraud | Not Covered | N/A |
| | | Verification Callback Amount $ N/A | | |
| (O) | | Telefacsimile Transfer Fraud | Not Covered | N/A |
| | | Verification Callback Amount $ N/A | | |
| (P) | | Destruction of Data or Programs By Hacker | $500,000 | $25,000 |
| (Q) | | Destruction of Data or Programs by Virus | $500,000 | $25,000 |
| (R) | | Voice Computer System Fraud | Not Covered | N/A |
| (S) | | Indemnity for Injury or Death of Directors or Employees | $10,000 | N/A |
| (T) | | Safe Deposit Box | | |
| | (T) (1) | Liability of Depository | See U-FIB-1015-B | See U-FIB-1015-B |
| | (T) (2) | Loss of Customers' Property | See U-FIB-1015-B | See U-FIB-1015 B |
| | | Includes ☒   Excludes ☐ Money           Money | | |
| (U) | | Stop Payment or Wrongful Dishonor | $10,000 | $500 |
| (V) | | Kidnap – Ransom - Extortion | N/A | N/A |

This Table is effective as of ___1/1/2018.___



# Schedule A

| Bond No. | Eff. Date of Bond. | Exp. Date of Bond | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Name of Insured:** Midstate Financial Corporation

| Optional Insuring Agreements and Coverages | Single Loss Limit of Liability | Single Loss Deductible |
|---|---|---|
| Data Processing Organizations | $4,000,000 | $25,000 |
| Debit Card | $50,000 | $25,000 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Financial Institution Select Bond



## Table of Contents

**INSURING AGREEMENTS**

| | | |
|---|---|---|
| (A) | Fidelity | p.1 |
| (B) | On Premises | p.1 |
| (C) | In Transit / Cash Letter | p.2 |
| (D) | Unauthorized Signature or Alteration | p.3 |
| (E) | Securities | p.3 |
| (F) | Counterfeit Currency | p.4 |
| (G) | Audit and Claims Expense | p.4 |
| (H) | Automated Teller Machines | p.4 |
| (I) | Fraudulent Mortgages | p.4 |
| (J) | Servicing Contractors | p.4 |
| (K) | Check Kiting Fraud | p.5 |
| (L) | Computer Systems Fraud | p.5 |
| (M) | Data Processing Service Operations | p.5 |
| (N) | Voice Initiated Transfer Fraud | p.6 |
| (O) | Telefacsimile Transfer Fraud | p.6 |
| (P) | Destruction of Data or Programs by Hacker | p.7 |
| (Q) | Destruction of Data or Programs by Virus | p.7 |
| (R) | Voice Computer Systems Fraud | p.7 |
| (S) | Indemnity for Injury or Death of Directors or Employees | p.8 |
| (T) | Safe Deposit Box | p.8 |
| (U) | Stop Payment or Wrongful Dishonor | p.9 |
| (V) | Kidnap – Ransom – Extortion | p.9 |

## GENERAL AGREEMENTS

(A)   Nominees ................................................................................................................ p.10

(B)   Additional Offices or Employees – Consolidation, Merger or Purchase of Assets – Notice ...................... p.11

(C)   Change of Control – Notice ................................................................................... p.11

(D)   Representation of Insured ...................................................................................... p.12

(E)   Joint Insured / Joint Payee ..................................................................................... p.12

(F)   Court Costs and Attorneys' Fees ........................................................................... p.12

(G)   Reimbursement for Reward Payments .................................................................. p.13

## CONDITIONS AND LIMITATIONS

Section 1.   Definitions ............................................................................................... p.13

Section 2.   Exclusions .............................................................................................. p.17

Section 3.   Discovery ............................................................................................... p.20

Section 4.   Limit of Liability ...................................................................................... p.20

Section 5.   Notice/Proof – Legal Proceedings Against Underwriter ........................ p.21

Section 6.   Valuation ................................................................................................ p.21

Section 7.   Assignment – Subrogation – Recovery – Cooperation .......................... p.22

Section 8.   Limit of Liability Under This Bond and Prior Insurance ......................... p.23

Section 9.   Other Insurance or Indemnity .............................................................. p.23

Section 10.  Ownership .............................................................................................. p.23

Section 11.  Deductible Amount ................................................................................ p.23

Section 12.  Termination or Cancellation .................................................................. p.24

Section 13.  Rights After Cancellation ....................................................................... p.24

Section 14.  Employee Benefit Plans ......................................................................... p.25

Section 15.  Conformity ............................................................................................. p.25

Section 16.  Change or Modification .......................................................................... p.25

Section 17.  Titles of Paragraphs ............................................................................... p.25



The Underwriter, in consideration of an agreed premium and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnity the Insured for

## INSURING AGREEMENTS

(A) **FIDELITY**

(1) Loss resulting directly from dishonest or fraudulent acts committed by an **employee** acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the **employee** with the intent

(a) to cause the Insured to sustain such loss; or

(b) to obtain financial benefit for the **employee** or another person or entity.

(2) However, if some or all of the Insured's loss results directly or indirectly from **loans** or **trading**, that portion of the loss is not covered unless the Insured shall first establish that

(a) the loss was directly caused by fraudulent or dishonest acts of an **employee**, and

(b) the fraudulent or dishonest acts were committed by the **employee** with the intent to cause the Insured to sustain such loss, and

(c) the **employee** intended to receive or did in fact receive a financial benefit, and

(d) if any of the loss results from **loans**, the **employee** was in collusion with one or more parties to the transactions.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other emoluments. Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other emoluments which the **employee** receives directly and solely as a result of a fraudulent or dishonest scheme and which are not part of the compensation that the Insured has agreed to pay the **employee** as part of that **employee's** compensation package, will not be considered an employee benefit earned in the normal course of employment.

(B) **ON PREMISES**

(1) Loss of property resulting directly from

(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof; or

(b) theft, false pretenses, common-law or statutory larceny, committed by a person present in an office or on the premises of the Insured,

while the **property** is lodged or deposited within offices or premises located anywhere.

(2) Loss of **property** belonging to a customer, representative of such customer or **employee** of the Insured resulting directly from

(a) any hazard specified in this Insuring Agreement, while the **property** is in the possession of a customer, representative of such customer or **employee**, and such customer, representative or **employee** is within the Insured's offices; or

(b) hold-up or robbery of a customer or representative of a customer, while such person is transacting business with the Insured at an outside window or other similar facility offered to the public and staffed by at least one of the Insured's **employees** during the Insured's normal operating hours; or

(c) hold-up or robbery of a customer, representative of a customer or employee, while such person is in any building or on any driveway, parking lot or similar facility maintained by the Insured as a convenience for customers using motor vehicles if such customer or representative is present in such

building or on such facility for the purpose of transacting business with the Insured at any of the Insured's offices covered hereunder; or such employee is present in such building or on such facility for the purposes of employment,

whether or not the Insured is liable for the loss thereof, and provided such loss, at the option of the Insured, is included in the Insured's proof of loss, but excluding, in any event, loss caused by such customer or any representative of such customer.

(3) Loss of or damage to

    (a) furnishings, fixtures, supplies or equipment within an office of the Insured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief; or

    (b) such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief,

    provided that

        (i) the Insured is the owner of such furnishings, fixtures, supplies, equipment, or office or is liable for such loss or damage, and

        (ii) the loss is not caused by fire.

Those premises of depositories maintained by a stock exchange shall be deemed to be premises of the Insured but solely as respects loss of **certificated securities**. **Certificated securities** held by such depository shall be deemed to be **property** to the extent of the Insured's interest therein as effected by the making of appropriate entries on the books and records of such depository.

## (C) IN TRANSIT / CASH LETTER

(1) Loss of **property** resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage thereto or destruction thereof, while the **property** is in transit anywhere in the custody of

    (a) a natural person acting as a messenger of the Insured (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger); or

    (b) a **transportation company** and being transported in an armored motor vehicle; or

    (c) a **transportation company** and being transported in a conveyance other than an armored motor vehicle provided that the **property** transported in such manner is not **money**, gems, jewelry or precious metals.

Coverage under this Insuring Agreement (C)(1) begins immediately upon the receipt of such **property** by the natural person or **transportation company** and ends immediately upon delivery to the designated recipient or its agent.

(2) Reasonable expenses, incurred in identifying the depositor of a lost item or in assisting a depositor to obtain a duplicate thereof, resulting directly from the physical destruction or unexplainable loss of an item enclosed and listed in a **transit cash letter** while in transit

    (a) between offices of the Insured; or

    (b) between any office of the Insured and any place in the United States of America or Canada during the course of collection, presentation or payment, provided that such item is still missing more than 20 days after the Insured learns that the item has not arrived at the intended destination.

This Insuring Agreement (C)(2)

    (i) is not subject to a Deductible Amount;

    (ii) does not cover expenses caused or contributed to by any dishonest or fraudulent act of an employee of a correspondent or payable-through bank to which the transit cash letter involved in the loss is transmitted or addressed.

## (D) UNAUTHORIZED SIGNATURE OR ALTERATION

Loss resulting directly from

(1) an unauthorized signature or alteration of, on or in any negotiable instrument (except an evidence of debt), acceptance, withdrawal order, receipt for the withdrawal of property, certificate of deposit or letter of credit; or

(2) the Insured having transferred, paid or delivered any funds or **property** or established any credit or given any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or **property**, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear an **unauthorized signature** or have been altered without the knowledge and consent of such customer or banking institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems, sent by a person other than the said customer or banking institution purporting to send such instructions or advices shall be deemed to bear an **unauthorized signature**.

A facsimile signature that is a mechanical or electronic reproduction of a handwritten signature is treated the same as a handwritten signature.

It shall be a condition precedent under this Insuring Agreement to the Insured's right of recovery for loss arising from the **unauthorized signature** on a check or **withdrawal order** drawn on a customer's account that the Insured shall have on file signatures of all persons authorized to sign checks or **withdrawal orders**.

(E) **SECURITIES**

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original

    (a) certificated security;

    (b) **document of title**;

    (c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property;

    (d) certificate of origin or title;

    (e) evidence of debt;

    (f) corporate, partnership or personal **guarantee**;

    (g) security agreement ;

    (h) instruction; or

    (i) statement of uncertificated security

    which

        (i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a **forgery**; or

        (ii) is altered; or

        (iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, **guarantee**, endorsement or any items listed in (a) through (h) above; or

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (d) above which is a **counterfeit**.

Actual physical possession of the items listed in (a) through (i) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

(F) **COUNTERFEIT CURRENCY**

Loss resulting directly from the receipt by the Insured, in good faith, of any counterfeit **money**.

(G) **AUDIT and CLAIMS EXPENSE**

    (1) Reasonable expenses incurred by the Insured for audits or examinations required by State or Federal supervisory authorities to be conducted either by such authorities or by independent accountants by reason of the discovery of any valid and collectible loss under Insuring Agreement (A), which loss exceeds the Single Loss Deductible amount applicable to such Insuring Agreement.

    (2) Reasonable expenses necessarily incurred and paid by the Insured in preparing any valid and collectible claim for loss under Insuring Agreement (A) , which loss exceeds the Single Loss Deductible amount applicable to such Insuring Agreement.

(H) **AUTOMATED TELLER MACHINES**

Loss of **property** caused by burglary, robbery and damage thereto or destruction thereof, while such **property** is located within any **automated teller machine**, and for the damage to or destruction of such **automated teller machine** caused by burglary or robbery or attempt threat.

(I) **FRAUDULENT MORTGAGES**

Loss resulting directly from the Insured having, in good faith and in the course of business, in connection with any **loan,** accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty or assignments of such mortgages, deeds of trust or like instruments which prove to be defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage, deed of trust or like instrument having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

(J) **SERVICING CONTRACTORS**

    (1) Loss resulting directly from dishonest or fraudulent acts committed by any **servicing contractor** acting alone or in collusion with others.

        Such dishonest or fraudulent acts must be committed by such **servicing contractor** with the intent

        (a) to cause the Insured to sustain such loss, and

        (b) to obtain improper personal financial benefit for the **servicing contractor** or for another person or entity.

    (2) Loss of **money** (including obligations of the United States of America) collected or received for the Insured by any such **servicing contractor** through the failure of such **servicing contractor** to pay to the Insured the **money** so collected or received as is discovered to be due and payable while this Insuring Agreement is in force, except, however, **money** disbursed by such **servicing contractor** in accordance with instructions from the Insured.

As used in this Insuring Agreement, financial benefit does not include any benefits earned in the normal  course of employment, or performance of the servicing contract, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other emoluments.

(K) **CHECK KITING FRAUD**

Loss resulting directly from check kiting fraud committed against the Insured.  Such fraud must be perpetrated by a customer of the Insured making constant, systematic, back and forth deposits between one or more accounts in different financial institutions, one of which is an Insured hereunder, utilizing checks of approximately the same amount to create the appearance of valid funds in the account(s), and involve deposits drawn against uncollected funds deposited in one institution to create the appearance of valid funds in the account of the other institution provided

        (a) such deposits are made by the Insured's customer with the intent to defraud the Insured, and

        (b) the Insured is, in fact, deceived by such deposits.

It shall be a condition precedent to the Insured's right of recovery under this Insuring Agreement that the Insured must stop the payment of any checks drawn on the customer's account immediately upon discovery of a check kiting fraud and return the checks drawn against uncollected funds.

(L) **COMPUTER SYSTEMS FRAUD**

Loss resulting directly from a fraudulent

(1)  entry of electronic data or computer program into; or

(2)  change of electronic data or computer program within

any **computer system** operated by the Insured, whether owned or leased; or any **computer system** identified in the application for this bond; or a **computer system** first used by the Insured during the Bond Period, as provided by General Agreement B,

provided that the entry or change causes

    (a)  **property** to be transferred, paid or delivered; or

    (b)  an account of the Insured, or of its customer, to be added, deleted, debited or credited; or

    (c)  an unauthorized account or a fictitious account to be debited or credited.

In this Insuring Agreement, fraudulent entry or change shall include such entry or change made by an **employee** of the Insured acting in good faith

    (i)  on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a **computer system** covered by this Insuring Agreement; or

    (ii)  on an instruction transmitted by **tested** telex or similar means of **tested** communication (except a **telefacsimile device**) identified in the application for this bond purportedly sent by a customer, financial institution or automated clearing house.

**(M) DATA PROCESSING SERVICE OPERATIONS**

Loss sustained by a client of the Insured resulting directly from a fraudulent

(1)  entry of electronic data or a computer program into; or

(2)  change of electronic data or a computer program within

a **computer system** covered under the terms of Insuring Agreement (L); or

(3)  entry or change of **electronic data** during electronic transmission or physical transit from the Insured to its client,

provided that the entry or change causes

    (a)  **property** to be transferred, paid or delivered;

    (b)  an account of the client, or a customer of the client, to be added, deleted, debited or credited; or

    (c)  an unauthorized account or a fictitious account to be debited or credited,

and for which loss the Insured is legally liable to the client as a provider of data processing services for such client.

In this Insuring Agreement, fraudulent entry or change shall include such entry or change made by an employee of the Insured acting in good faith

    (i)  on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a **computer system** covered by this Insuring Agreement; or

    (ii)  on an instruction transmitted by **tested** telex or similar means of **tested** communication identified in the application for this bond purportedly sent by a customer, financial institution, or automated clearing house.

In this Insuring Agreement, client means an entity for whom the Insured serves as data processor under the terms of a written agreement.

**(N)  VOICE INITIATED TRANSFER FRAUD**

Loss resulting directly from the Insured having, in good faith, transferred funds from a customer's account through a **computer system** covered under the terms of Insuring Agreement (L) in reliance upon a fraudulent voice instruction transmitted by telephone which purported to be other than a **repetitive transfer instruction**, and was purported to be from

(1)  an officer, director, partner or employee of a customer of the Insured who was authorized by the customer to instruct the Insured to make such transfer;

(2)  an individual person who is a customer of the Insured; or

(3)  an **employee** of the Insured in another office of the Insured who was authorized by the Insured to instruct other **employees** of the Insured to transfer funds,

and was received by an **employee** of the Insured specifically designated to receive and act upon such instructions, but the voice instruction was not from a person described in (1), (2) or (3) above,

provided that

    (a)  such voice instruction was documented, the documentation was signed by the **employee** receiving the instruction, required password(s) or code word(s) were given, and

    (b)  if the transfer was in excess of the amount shown in the Table of Limits of Liability and Deductible Amounts as the verification callback amount for this Insuring Agreement, the voice instruction was verified by a callback from a different **employee** according to a prearranged procedure and the callback was documented and signed by such **employee**.

As used in this Insuring Agreement, customer means an entity or individual which has a written agreement with the Insured authorizing the Insured to rely on voice instructions to initiate transfers and has provided the Insured with the names of persons authorized to initiate such transfers, and with which the Insured has established an instruction verification mechanism, and funds means **money** on deposit in an account.

(O)  **TELEFACSIMILE TRANSER FRAUD**

Loss resulting directly from the Insured having, in good faith, transferred or delivered funds, **certificated securities** or **uncertificated securities** through a **computer system** covered under the terms of Insuring Agreement (L) in reliance upon a fraudulent instruction received through a **telefacsimile device**, and which instruction

(1)  purports to be other than a **repetitive transfer instruction**, and

(2)  purports and reasonably appears to have originated from

    (a)  a customer of the Insured;

    (b)  another financial institution; or

    (c)  another office of the Insured,

but, in fact, was not originated by the customer or entity whose identification it bears, and

(3)  contains a valid test code which proves to have been used by a person who was not authorized to make use of it, and

(4)  contains the name of a person authorized to initiate such transfer,

provided that, if the transfer was in excess of the amount shown in the Table of Limits of Liability and Deductible Amounts as the verification callback amount for this Insuring Agreement, the instruction was verified by a callback according to a prearranged procedure.

As used in this Insuring Agreement, customer means an entity or individual which has a written agreement with the Insured authorizing the Insured to rely on **telefacsimile device** instructions to initiate transfers and has provided the Insured with the names of persons authorized to initiate such transfers, and with which the Insured has established an instruction verification mechanism, and funds means **money** on deposit in an account.

(P)  **DESTRUCTION OF DATA OR PROGRAMS BY HACKER**

Loss resulting directly from the malicious destruction of, or damage to, **electronic data** or **computer programs** owned by the Insured or for which the Insured is legally liable while stored within a **computer system** covered under the terms of Insuring Agreement (L).

The liability of the Underwriter shall be limited to the cost of duplication of such **electronic data** or **computer programs** from other **electronic data** or **computer programs** which shall have been furnished by the Insured.

In the event, however, that destroyed or damaged **computer programs** cannot be duplicated from other **computer programs**, the Underwriter will pay the cost incurred for computer time, computer programmers, consultants or other technical specialists as is reasonably necessary to restore the **computer programs** to substantially the previous level of operational capability.

(Q) **DESTRUCTION OF DATA OR PROGRAMS BY VIRUS**

Loss resulting directly from the malicious destruction of, or damage to, **electronic data** or **computer programs** owned by the Insured or for which the Insured is legally liable while stored within a **computer system** covered under the terms of Insuring Agreement (L) if such destruction or damage was caused by a computer program or similar instruction which was written or altered to incorporate a hidden instruction designed to destroy or damage **electronic data** or **computer programs** in the **computer system** in which the computer program or instruction so written or so altered is used.

The liability of the Underwriter shall be limited to the cost of duplication of such **electronic data** or **computer programs** from other **electronic data** or **computer programs** which shall have been furnished by the Insured.

In the event, however, that destroyed or damaged **computer programs** cannot be duplicated from other **computer programs**, the Underwriter will pay the cost incurred for computer time, computer programmers, consultants or other technical specialists as is reasonably necessary to restore the **computer programs** to substantially the previous level of operational capability.

**Special Condition:**

Under this Insuring Agreement, loss means all covered costs incurred by the Insured between the time destruction or damage is discovered and the time the **computer system** is restored to substantially the previous level of operational capability. Recurrence of destruction or damage after the **computer system** is restored shall constitute a separate loss.

(R) **VOICE COMPUTER SYSTEM FRAUD**

Loss resulting directly from charges for voice telephone long-distance toll calls which were incurred due to the fraudulent use or fraudulent manipulation of an **account code** or **system password** required to obtain access to a **voice computer system** owned or leased by the Insured, installed on the Insured's premises, whose **system administration** is performed and controlled by the Insured; provided, however, that the unauthorized access was not made possible by

(1) failure to incorporate a **system password** feature or failure to change the **system password** at least once every 30 days thereafter; or

(2) failure to have a call-disconnect feature in operation to automatically terminate a caller's access to the **voice computer system** after not more than three unsuccessful attempts to input an **account code**.

**Special Condition:**

Under this Insuring Agreement, loss means loss resulting from toll call charges made only on telephone lines directly controlled by one **voice computer system** and only toll call charges occurring for a period of not more than 30 days inclusive of the date on which the first such toll call charge was made.

(S) **INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR EMPLOYEES**

(1) Payments of **money** as the Insured, in its own discretion, shall make to any of its directors or employees, who during the term of this bond and while performing services anywhere for the Insured, shall have sustained bodily injury inflicted by any person while such person is committing or attempting to commit any act of larceny, theft, robbery or burglary, provided, that the Underwriter's maximum liability for the total payments made to one director or employee shall be limited to a sum equivalent to $500 per week during the period the director or employee requires medical or surgical treatment, hospital confinement or the services of a trained nurse, as a result of injury inflicted during any one such event, not exceeding $10,000.

(2) Payments of **money** as the Insured, in its own discretion, shall make to any of its directors, employees or their estate, who during the term of this bond and while performing any service anywhere for the Insured, shall have died as the result of any bodily injury inflicted by any person while such person is committing or attempting to commit any act of larceny, theft, robbery or burglary, up to the amount of $10,000 less, however, such sum or sums the Underwriter has paid pursuant to Insuring Agreement (S)(1).

(T) **SAFE DEPOSIT BOX**

(1) Liability of Depository

All sums which the Insured shall become legally obligated to pay by reason of liability for loss, damage or destruction of customers' property as defined in this Insuring Agreement.

(2) Loss of Customers' Property

Loss of customers' property by burglary or robbery or attempt thereat or for damage to or destruction of customers' property, provided such loss is included in the Insured's proof of loss.

As used in this Insuring Agreement, customers' property means

    (a) **money**, except if excluded under Insuring Agreement (T)(2), bonds, drafts, **acceptances**, other **certificated securities**, valuable papers, valuable documents, jewelry, silverware and other property while in customer's safe deposit boxes in vaults on the Insured's premises;

    (b) such items as set forth in (a) above

        (i) while stored in such vaults by or for customers, or temporarily elsewhere on the premises and in the course of deposit in or removal from such boxes or vaults; or

        (ii) while being relocated from one of the Insured's offices to another such office, provided that

            1. the safe deposit boxes are

                a. transported with a police escort,

                b. accompanied and observed at all times by two officers of the Insured, and

                c. moved by an armored car service or carrier for hire, and

            2. signed affidavits are obtained from the officers present during the move confirming the safe deposit boxes arrived at the new location intact and had not been tampered with.

Customers' property may be owned by customers or held by them in any capacity, whether or not the customers are liable to others for loss thereof.

Customers' property does not mean **certificated securities** verified and recorded by the Insured and held by it in any capacity or **money** segregated and identified as payroll or funds for delivery to the Insured or a customer.

(U) **STOP PAYMENT OR WRONGFUL DISHONOR**

Loss which the Insured shall become legally obligated to pay a customer or authorized representative of such customer for damages due to the Insured's

(1) failure to comply with any notice from any customer of the Insured or any authorized representative of such customer to stop payment of any **negotiable instrument** made or drawn by such customer; or

(2) refusal to pay any **negotiable instrument** made or drawn by a customer of the Insured; or

(3) failure to give proper notice of dishonor of a **negotiable instrument**, but only with respect to a **negotiable instrument** other than a traveler's check,

    (a) payable by the Insured and drawn, made or accepted by a customer of the Insured, and

    (b) for which a notice of stop payment is first received by the Insured or presentment is first made to the Insured during the Bond Period.

Damages under subparagraph (2) above shall not include the amount of any **negotiable instrument** in question, nor any amounts paid to the payee, endorser or accommodation party of such **negotiable instrument**.

(V) **KIDNAP – RANSOM – EXTORTION**

(1) Loss of **money** or the monetary value of other consideration surrendered as payment by or on behalf of the Insured pursuant to a ransom or extortion demand resulting from

    (a) the actual of alleged **kidnapping** of an **insured person** first occurring during the Bond Period;

    (b) a threat first made during the Bond Period to kill, injure, or **kidnap** an **insured person**;

(c) a threat first made during the Bond Period to cause physical damage to and/or contaminate or pollute the Insured's property; (For the purpose of this Insuring Agreement, property means all real and personal property owned, controlled or leased by the Insured or for which the Insured is legally liable.)

(d) a threat first made during the Bond Period to disseminate, divulge or utilize any confidential, private or secret information unique to the Insured's business contained on or in drawings, negatives, microfilm, tapes, transparencies, manuscripts, prints, computer disks, and other records of similar nature which are protected by physical or electronic controls; or

(e) a threat first made during the Bond Period to alter, adulterate or destroy any of the Insured's **computer programs** by introducing into the Insured's **computer systems** instructions or data which are not authorized by the Insured.

NOTIFICATION:  Before surrendering any **money** or other consideration the person authorizing the surrender shall notify or make every reasonable attempt to notify as soon as practicable

(i) the Federal Bureau of Investigation or local law enforcement agencies bearing in mind the safety of the person(s) held or threatened, and

(ii) a director or officer of the Insured not already aware of the ransom or extortion demand, if the property to be surrendered is owned or held by the Insured or is property for which the insured is legally liable.

(2) Reasonable expenses incurred by the Insured arising directly out of or related to a ransom or extortion demand covered under Insuring Agreement (V)(1).

(3) Loss due to actual damage, destruction, disappearance, confiscation or wrongful abstraction of **money** or other consideration while being delivered by authorized persons for payment of a ransom or extortion demand covered under Insuring Agreement (V)(1).

(4) Loss resulting directly from judgments, settlements and defense costs, incurred by the Insured with the prior consent of the Underwriter.  Such judgments, settlements, and defense costs must result from a claim or suit for damages brought against the Insured by any **insured person** or the estate, heirs or legal representatives of an **insured person**, alleging negligence or incompetence in negotiating or obtaining the release of such **insured person** following a **kidnapping** covered under Insuring Agreement (V)(1).  As additional conditions precedent to the Underwriter's liability, the Insured shall (a) immediately notify the Underwriter of any such claim or suit, and (b) not admit liability in any such claim or suit, and (c)  defend such claim or suit, and (d) provide the Underwriter such information and cooperation reasonably required.  The Underwriter shall have the right, but not the duty, to investigate, negotiate or settle any such claim or suit and to take over the conduct of the defense thereof.  The Insured shall cooperate with the Underwriter in all aspects of defense, investigation, negotiation or settlement of any such claim or suit.

As used in this Insuring Agreement, expenses mean

(a) reasonable fees and expenses of an independent negotiator or consultant;

(b) reasonable interest on any loan obtained by the Insured to pay a loss covered under Insuring Agreement (V)(1); provided, however, that the Underwriter shall not be liable for any interest accruing prior to 30 days preceding the date of such ransom or extortion payment nor subsequent to the date of reimbursement from the Underwriter;

(c) reasonable reward money paid by the Insured to an **informant** which leads to the arrest and conviction of parties responsible for any loss recoverable under Insuring Agreement (V)(1), provided the Underwriter consents to such offer of reward;

(d) reasonable travel and accommodations incurred by the Insured in connection with the ransom or extortion demand covered under Insuring Agreement (V)(1);

(e) payment of salaries or wages of an employee of the Insured who is **kidnapped**, at the annual rate in effect immediately prior to the **kidnapping**, for the period commencing with the abduction of the employee and ceasing upon the earliest of (i) the release of the employee; (ii) discovery of the death of the employee; (iii) 120 days after the last credible evidence following the abduction that the employee is alive; or (iv) 36 months after the abduction;

(f) other reasonable expenses incurred by the Insured in the investigation, negotiation or payment of a loss covered under Insuring Agreement (V)(1);

(g) reasonable fees for the necessary medical treatment of an **insured person** who was **kidnapped**, incurred within 12 months following such **insured person's** release; and

(h) any personal financial loss suffered by an **insured person** who is **kidnapped** solely as a direct result of the physical inability of the **kidnap** victim to attend to personal financial matters. Coverage as provided hereunder shall include, but not be limited to, failure to renew insurance contracts, failure to exercise stock options, and failure to respond to margin or loan calls by financial institutions. The maximum liability of the Underwriter for such personal financial loss shall not exceed 25% of the Single Loss Limit of Liability of Insuring Agreement (V) set forth in the Table of Limits of Liability and Deductible Amounts.

In the event of a ransom or extortion demand directed against any **insured person(s)** rather than against the Insured, **money** or other considerations surrendered by or on behalf of such **insured person(s)** and expenses described in (a), (b), (c), (d) and (h) above, incurred by or on behalf of such **insured person** shall, at the option of the Insured, be considered money or other consideration surrendered on behalf of the Insured.

In the event that any nonemployee director is protected for loss of personal assets as stated above under this bond and simultaneously under any other policy/bond or policies/bonds issued by the Underwriter, it is agreed that the Underwriter's aggregate liability for the loss of the personal assets of such director shall not be cumulative and shall in no event exceed the largest amount of coverage available under any one such policy/bond.

## GENERAL AGREEMENTS

### (A) NOMINEES

Loss sustained by any nominee organized by the Insured for the purpose of handling certain of its business transactions and composed exclusively of its **employees** shall, for all the purposes of this bond and whether or not any partner of such nominee is implicated in such loss, be deemed to be loss sustained by the Insured.

### (B) ADDITIONAL OFFICES OR EMPLOYEES – CONSOLIDATION, MERGER OR PURCHASE OF ASSETS – NOTICE

(1) If the Insured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the Bond Period.

(2) If the Insured shall, while this bond is in force, consolidate or merge with, or purchase or acquire assets or liabilities of, or purchase or acquire more than 50% voting stock ownership of another institution (herein referred to as acquisition), the Insured shall not have such coverage as is afforded under this bond for loss which

(a) has occurred or will occur in offices or premises; or

(b) has been caused or will be caused by an employee or employees of such institution; or

(c) has arisen or will arise out of the assets or liabilities acquired by the Insured as a result of such acquisition, unless the Insured shall

(i) give the Underwriter written notice of the proposed acquisition prior to the proposed effective date of such action, and

(ii) obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, **employees** and other exposures, and

(iii) upon obtaining such consent, pay to the Underwriter an additional premium.

(3) Notwithstanding anything stated above to the contrary, if the acquisition involves assets and liabilities in an amount less than 25% of the consolidated assets and liabilities of all Insureds on the day immediately preceding the acquisition, the Underwriter agrees to provide coverage under this bond, without notice or payment of an additional

premium to the Underwriter, as of the effective date of the acquisition until the end of the Bond Period, provided all of the following conditions have been met:

(a) the acquisition was not through a regulatory-assisted transaction,

(b) the acquisition was not the subject of any regulatory agreement or stipulation prior to the effective date of the acquisition,

(c) there shall have been neither paid nor pending claim or claims of the type covered by this bond in excess of the Single Loss Deductible amount under this bond for the three-year period immediately prior to the date of acquisition, and

(d) a due diligence examination has been performed for/by the Insured and has not discovered anything that would cause a reasonable person to assume that a loss of the type covered by this bond has been or will be incurred.

(4) If the conditions in the above paragraphs are not fulfilled, the Insured shall have such coverage as is afforded under this bond as respects the acquisition for loss which

(a) is incurred or sustained, due to any act or acts committed by any person or persons, whether or not **employees** of the Insured, after the effective date of such acquisition, and

(b) is discovered prior to the expiration of 90 days after the effective date of such acquisition, or if the bond is terminated or canceled as an entirety prior to the expiration of the said 90 days, prior to the termination or cancellation of the bond, and

(c) occurs in the offices or premises, or is caused by an **employee** or **employees** of the institution acquired by the Insured as a result of such acquisition.

(C) **CHANGE OF CONTROL – NOTICE**

When the Insured learns of a change in control, it shall give written notice to the Underwriter.

As used in this General Agreement, control means the power to determine the management or policy of a controlling holding company or the Insured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of 10% or more of such stock shall be presumed to result in a change of control for the purpose of the required notice.

Failure to give the required notice shall result in termination of coverage for any loss involving a transferee, to be effective upon the date of the stock transfer.

(D) **REPRESENTATION OF INSURED**

No statement made by or on behalf of the Insured, whether contained in the application of this bond or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement. Such application constitutes part of this bond.

Any intentional misrepresentation, omission, concealment or incorrect statement of a material fact, in the application or otherwise, shall be grounds for the rescission of this bond.

(E) **JOINT INSURED / JOINT PAYEE**

(1) If two or more Insureds are covered under this bond, the first-named Insured shall act for all Insureds. Payment by the Underwriter to the first-named Insured of loss sustained by any Insured shall fully release the Underwriter on account of such loss. If the first-named Insured ceases to be covered under this bond, the Insured next named shall thereafter be considered as the first-named Insured. Knowledge possessed or discovery made by any Insured shall constitute knowledge or discovery by all Insureds for all purposes of this bond. The liability of the Underwriter for loss or losses sustained by all Insureds shall not exceed the amount for which the Underwriter would have been liable had all such loss or losses been sustained by one Insured.

(2) At the written request of the first-named Insured, any payment in satisfaction of loss covered by said bond involving **money** or other **property** in which the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation or the Government National Mortgage Association has an interest shall be paid by an instrument issued to such organizations and the first-named Insured as joint loss payees, subject to the following conditions and limitations:

(a) The attached bond is for the sole use and benefit of the named Insured as expressed herein.  The organizations named above shall not be considered as Insureds under this bond, nor shall they otherwise have any rights or benefits under this bond.

(b) Regardless of the number of requests for such payments or the number of loss payees, the amount paid for any one loss shall not exceed the Limit of Liability as set forth in the Table of Limits of Liability and Deductible Amounts.

(F) **COURT COSTS AND ATTORNEYS' FEES**

The Underwriter shall indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability, on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under the terms of this bond in excess of any Deductible Amount.

The Insured shall notify the Underwriter at the earliest practicable moment, not to exceed 60 days after the notice thereof, of any such suit or legal proceeding and at the request of the Underwriter shall furnish it with copies of all pleadings and other papers therein.  At the Underwriter's election the Insured shall permit the Underwriter to conduct the defense of such suit or legal proceeding, in the Insured's name, through attorneys of the Underwriter's selection.  In such event, the Insured shall give all reasonable information and assistance, other than pecuniary, which the Underwriter shall deem necessary to the defense of such suit or legal proceeding.  If the amount of the Insured's liability or alleged liability is greater than the amount recoverable under this bond, or if a Deductible Amount is applicable, or both, the liability of the Underwriter under this General Agreement is limited to the proportion of court costs and attorneys' fees incurred and paid by the Insured or by the Underwriter that the amount recoverable under this bond bears to the total of such amount plus the amount which is not so recoverable.  Such indemnity shall be a part of the Single Loss Limit of Liability for the applicable Insuring Agreement or Coverage.

If the Underwriter pays court costs and attorneys' fees in excess of its proportionate share of such costs and fees, the Insured shall promptly reimburse the Underwriter for such excess.

(G) **REIMBURSEMENT FOR REWARD PAYMENTS**

The Underwriter agrees to indemnify the Insured up to an amount of $10,000 per event, for any reward(s) paid by the Insured for information leading to the capture or apprehension of any person(s) who, while this bond is in force, shall have robbed any of the Insured's messengers, or robbed or burglarized any of the Insured's offices or branches, or shall have made an attempt threat.

## CONDITIONS AND LIMITATIONS

**DEFINITIONS**

Section 1.

As used in this bond,

(a) **Acceptance** means a draft, which the drawee has, by signature written thereon, engaged to honor as presented.

(b) **Account code** means a confidential and protected string of characters which identifies or authenticates a person and permits that person to gain access to a **voice computer system** for the purpose of making toll calls or utilizing voice mail box messaging capabilities or other similar functional features of the system.

(c) **Automated teller machine** means a device which, on behalf of the Insured, disburses **money**, accepts deposits, cashes checks or similar written instruments, or makes credit card loans.

(d) **Certificate of deposit** means an acknowledgment in writing by a financial institution of receipt of **money** with an engagement to repay it.

(e) **Certificate of origin or title** means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(f) **Certificated security** means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is

    (1) represented by an instrument issued in bearer or registered form,

    (2) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment, and

    (3) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

(g) **Computer program** means a set of related electronic instructions which direct the operations and functions of a computer or devices connected to it, which enable the computer or devices to receive, process, store or send **electronic data**.

(h) **Computer system** means

    (1) computers with related peripheral components, including storage components wherever located,

    (2) systems and applications software,

    (3) terminal devices, and

    (4) related communication networks

by which **electronic data** are electronically collected, transmitted, processed, stored and retrieved.

(i) **Counterfeit** means an imitation of an actual valid original, which is intended to deceive and to be taken as the original.

(j) **Document of title** means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

(k) **Electronic data** means facts or information converted to a form usable in a **computer system** by **computer programs** and which is stored on magnetic tapes or disks, or optical storage disks or other bulk media.

(l) **Employee** means

    (1) an officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises;

    (2) an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured;

    (3) a person provided by an employment contractor to perform employee duties for the Insured under the Insured's supervision at any of the Insured's offices or premises covered hereunder;

    (4) an employee of an institution merged or consolidated with the Insured prior to the effective date of this bond; and

    (5) each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured (not including preparation or modification of computer software or programs), herein called processor. (Each such processor, and the partners, officers and employees of such processor shall, collectively, be deemed to be one **employee** for all the purposes of this bond, excepting, however, the second paragraph of Section 12. A Federal Reserve Bank or clearing house shall not be construed to be a processor.)

(m) **Evidence of debt** means an instrument, including a **negotiable instrument**, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

(n) **Forgery** means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(o) **Guarantee** means a written undertaking obligating the signer to pay the debt of another to the Insured or its assignee or to a financial institution from which the Insured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(p) **Informant** means any person, other than an **insured person**, providing information not otherwise obtainable, solely in return for a monetary payment paid by the Insured or **insured persons**.

(q) **Insured persons** mean (1) any director, officer or employee of the Insured; (2) any **relative** of such director, officer or employee; (3) any person residing in the home of such director, officer or employee; (4) any guest in the home of such director, officer or employee; and (v) any guest or customer of the Insured while on the premises.

(r) **Instruction** means a written order to the issuer of an **uncertificated security** requesting that the transfer, pledge, or release from pledge of the **uncertificated security** specified be registered.

(s) **Kidnap** or **kidnapping** means the abduction under duress or by fraudulent means of an **insured person**, except a minor by his or her parent, and the detention of such person, or the involuntary holding captive of an **insured person** by persons who demand **money** or other consideration in exchange for the release of such detained person.

(t) **Letter of credit** means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the **letter of credit**.

(u) **Loan** means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.

(v) **Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

(w) **Negotiable instrument** means any writing

    (1) signed by the maker or drawer, and

    (2) containing any unconditional promise or order to pay a sum certain in **money** and no other promise, order, obligation or power given by the maker or drawer, and

    (3) is payable on demand or at a definite time, and

    (4) is payable to order or bearer.

(x) **Property means money, certificated securities, uncertificated securities, negotiable instruments, certificates of deposit, documents of title, acceptances, evidences of debt, security agreements, withdrawal orders, certificates of origin or title, letters of credit,** insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records whether recorded in writing or electronically, gems, jewelry, precious metals in any form, and tangible items of personal property which are not hereinbefore enumerated.

(y) **Relative** means a spouse, sibling, ancestor, spouse's ancestor, lineal descendant or lineal descendant's spouse, of any **insured person**. Adoptive children and stepchildren shall be deemed to be lineal descendants. Adoptive parents or stepparents shall be deemed to be ancestors.

(z) **Repetitive transfer instruction** means an instruction, other than the first such instruction, pursuant to an agreement between a **customer** of the Insured and the Insured where such parties have agreed that requests to transfer funds from certain designated accounts of the **customer** to certain designated other accounts and otherwise within the parameters of the agreement will be honored without verification.

(aa) **Security agreement** means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

(bb) **Servicing contractor** means a natural person, partnership or corporation, other than an officer or employee of the Insured, duly authorized by the Insured to perform any or all of the following:

    (1) collect and record payments on real estate mortgage or home improvement loans made, held or assigned to the Insured, and establish tax and insurance escrow accounts,

    (2) manage real property owned by or under the supervision or control of the Insured,

(3)  perform other acts directly related to the above,

but only while such natural person, partnership or corporation is actually performing such services within the United States of America, the Virgin Islands, Puerto Rico or Canada.  In no event shall any activity described in (1), (2) or (3) above include the sale of real property mortgages to the Insured by the **servicing contractor** or by any affiliate of the **servicing contractor**.

The term **servicing contractor** shall include the partners, officers and employees of such **servicing contractors** and each such **servicing contractor** and its partners, officers and employees shall collectively be deemed to be one person for all purposes of subsection (c) of Section 4. LIMIT OF LIABILITY / NONACCUMULATION OF LIABILITY.

(cc)  **Statement of uncertificated security** means a written statement of the issuer of an **uncertificated security** containing

    (1)  a description of the issue of which the **uncertificated security** is a part,

    (2)  the number of shares or units

        a.  transferred to the registered owner;

        b.  pledged by the registered owner to the registered pledgee;

        c.  released from pledge by the registered pledgee;

        d.  registered in the name of the registered owner on the date of the statement; or

        e.  subject to pledge on the date of the statement,

    (3)  the name and address of the registered owner and registered pledgee,

    (4)  a notation of any liens and restrictions of the issuer and any adverse claims to which the **uncertificated security** is or may be subject or a statement that there are none of those liens, restrictions or adverse claims, and

    (5)  the date

        a.  the transfer of the shares or units to the new registered owner of the shares or units was registered;

        b.  the pledge of the registered pledgee was registered; or

        c.  of the statement, if it is a periodic or annual statement.

(dd)  **System administration** means the performance of security functions including, but not limited to, defining authorized persons to access a **voice computer system** and adding, changing and deleting **account codes** or passwords in connection therewith; and invoking or revoking a system option which directs telephone call routing or which adds, moves or drops telephone lines or which performs any other similar activity allowed by a hardware or software-based system option that has been incorporated by a manufacturer or vendor into a system or any component thereof provided said system option is not intended for the sole use of such manufacturer or vendor.

(ee)  **System maintenance** means the performance of hardware and software installation, diagnostics and corrections and similar activities that are performed in the usual custom and practice by a manufacturer or vendor to establish or maintain the basic operational functionality of a **voice computer system** or any component thereof.

(ff)  **System password** means a confidential and protected string of characters which identifies or authenticates a person and permits that person to gain access to a **voice computer system** or any portion thereof for the purpose of performing **system administration** or **system maintenance** activities.

(gg)  **Telefacsimile device** means a machine capable of sending or receiving a duplicate image of a document by means of electronic impulses transmitted through a telephone line and which reproduces the duplicate image on paper.

(hh)  **Tested** means a method of authenticating the contents of a communication by placing a valid test key on it which has been agreed upon by the Insured and a customer, automated clearing house, or another financial institution for the purpose of protecting the integrity of the communication in the ordinary course of business.

(ii)  **Trading** means any purchase, exchange, or sale transaction, with or without knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer account, actual or fictitious.

(jj)  **Transit cash letter** means a letter or package sent by the Insured and/or any of its correspondent banks, and/or any Federal Reserve Bank or branch thereof, containing checks, promissory notes, drafts or similar items which are itemized

by separate amounts and accepted by the Insured for deposit, payment, collection or encashment itemized and identified in a list which accompanies such items.

(kk) **Transportation company** means any organization which provides its own or leased vehicles for transportation or which provides freight forwarding or air express services.

(ll) **Unauthorized signature** means the signing of a name of a person or organization made without actual, implied or apparent authority and includes a **forgery**.

(mm) **Uncertificated security** means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is

    (1) not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer,

    (2) of a type commonly dealt in on securities exchanges or markets, and

    (3) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

(nn) **Voice computer system** means a **computer system** installed in one location which functions as a private branch exchange (PBX), voice mail processor, automated call attendant or provides a similar capability used for the direction or routing of telephone calls in a voice communications network.

(oo) **Withdrawal order** means a nonnegotiable instrument, other than an instruction, signed by a customer of the Insured authorizing the Insured to debit the customer's account in the amount of funds stated therein.

## EXCLUSIONS

Section 2.

This bond does not cover

(a) loss resulting directly or indirectly from unauthorized signature, forgery or alteration, except when covered under Insuring Agreement (A), (D), (E) or (F);

(b) loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit in the circumstances recited in Insuring Agreement (C), and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Insured in initiating such transit;

(c) loss resulting directly or indirectly from the effects of nuclear fission or fusion or radioactivity; provided, however, that this paragraph shall not apply to loss resulting from industrial uses of nuclear energy;

(d) loss resulting directly or indirectly from any acts of any director or trustee of the Insured other than one employed as a salaried, pensioned or elected official or an **employee** of the Insured, except when performing acts coming within the scope of the usual duties of an **employee**, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured;

(e) loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any **loan** or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or **evidences of debt**, whether such **loan**, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), (E), (I) or (K);

(f) loss of **property** contained in customers' safe deposit boxes, except when (1) the Insured is legally liable therefor and the loss is covered under Insuring Agreement (A) or (2) the loss is covered under Insuring Agreement (T);

(g) loss caused by an **employee**, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to **property**;

(h)  loss resulting directly or indirectly from **trading**, except when covered under Insuring Agreement (A) provided that a limit for Trading Coverage is shown in the Table of Limits of Liability and Deductible Amounts, or Insuring Agreement (D) or (E);

(i)  shortage in any teller's cash due to error, regardless of the amount of such shortage, and any shortage in any teller's cash which is not in excess of the normal shortage in the tellers' cash in the office where such shortage shall occur shall be presumed to be due to error;

(j)  loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards

    (1)  in obtaining credit or funds;

    (2)  in gaining access to **automated teller machines** which, on behalf of the Insured, disburse **money**, accept deposits, cash checks, drafts or similar written instruments or make credit card loans;  or

    (3)  in gaining access to point of sale terminals, customer-bank communication terminals, or similar electronic terminals of electronic funds transfer systems,

whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under Insuring Agreement (A).

(k)  loss involving **automated teller machines**, unless such **automated teller machines** are situated within an office of the Insured which is permanently staffed by an **employee** whose duties are those usually assigned to a bank teller, even though public access is from outside the confines of such office, but in no event shall the Underwriter be liable for loss (including loss of **property**)

    (1)  as a result of damage to such **automated teller machines** from vandalism or malicious mischief perpetrated from outside such office;

    (2)  as a result of failure of such **automated teller machines** to function properly; or

    (3)  through misplacement or mysterious unexplainable disappearance while such **property** is located within any such **automated teller machines**,

except when covered under Insuring Agreement (A) or (H);

(l)  loss through the surrender of **property** away from an office of the Insured as a result of a threat

    (1)  to do bodily harm to any person, except loss of **property** in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Insured of any such threat; or

    (2)  to do damage to the premises or property of the Insured,

except when covered under Insuring Agreement (A) or (V);

(m)  loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or except when covered under Insuring Agreement (A);

(n)  loss resulting directly or indirectly  from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including, but not limited to, **unauthorized signature** or any other fraud, except when covered under Insuring Agreement (A) or (K);

(o)  loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement (A), (E) or (F);

(p)  loss of any tangible item of personal property which is not specifically enumerated in the paragraph defining **property** and for which the Insured is legally liable, if such property is specifically insured by other insurance of any kind and in any amount obtained by the Insured, and in any event, loss of such property occurring more than 60 days after the Insured shall have become aware that it is liable for the safekeeping of such property, except when covered under Insuring Agreements (A), (B)(2), (B)(3) or (T);

(q)  loss of **property** while

    (1)  in the mail; or

(2)  in the custody of any **transportation company**, unless covered under Insuring Agreement (C),

except when covered under Insuring Agreement (A);

(r)  potential income, including, but not limited to, interest and dividends, not realized by the Insured;

(s)  damages of any type for which the Insured is legally liable, except compensatory damages, but not multiples thereof, arising directly from a loss covered under this bond;

(t)  all fees, costs and expenses incurred by the Insured in establishing the existence of or amount of loss covered under this bond, except to the extent covered under Insuring Agreement (G);

(u)  indirect or consequential loss of any nature;

(v)  loss resulting from any violation by the Insured or by any **employee**

(1)  of law regulating (i) the issuance, purchase or sale of securities, (ii) securities transactions upon security exchanges or over the counter market, (iii) investment companies, or (iv) investment advisers; or

(2)  of any rule or regulation made pursuant to any such law, unless it is established by the Insured that the act or acts which caused the said loss involved fraudulent or dishonest conduct which would have caused a loss to the Insured in a similar amount in the absence of such laws, rules or regulations;

(w)  loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver, on demand of the Insured, funds or **property** of the Insured held by it in any capacity, except when covered under Insuring Agreement (A) or (B)(1)(a);

(x)  with respect to Insuring Agreement (T), loss of customers' property held by the Insured in trust for more than 30 days or as collateral;

(y)  with respect to Insuring Agreement (V), loss resulting directly or indirectly from confiscation or expropriation of reward or ransom money by any governmental authority;

(z)  loss resulting directly or indirectly from the assumption of liability by the Insured by contract unless the liability arises from a covered loss under Insuring Agreement (L), (M), (N), (O), (P), (Q), (R), (T) or (U) and would be imposed on the Insured regardless of the existence of the contract;

The following exclusions  (aa), (bb), (cc) and (dd) are applicable to  Insuring Agreement (J) only:

(aa)  loss resulting from the insolvency, bankruptcy or taking over by a receiver or other liquidator or by State or Federal officials of any depository institution, unless such depository is a **servicing contractor** covered under this bond and unless such insolvency, bankruptcy or taking over results from fraud or dishonesty of officers or employees of such depository institution;

(bb)  under paragraph (2), loss through the failure of any **servicing contractor** covered under this bond to collect or receive **money** for the account of the Insured, any agreement between such **servicing contractor** and the Insured to the contrary notwithstanding;

(cc)  under paragraph (2), loss of **money** collected or received for the account of the Insured by any **servicing contractor** covered under this bond, unless such **servicing contractor** is legally liable to the Insured on account of the loss of such **money**;

(dd)  loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any **loan** made to a **servicing contractor**, including any **loan** established to provide funds for interim financing or "warehousing" of mortgage loans, whether procured in good faith or through fraud or false pretenses, or loss resulting directly or indirectly from the failure of the **servicing contractor** to pay over **property** held as security for any such **loan**.

The following exclusions are applicable  to Insuring Agreements (L), (M), (N), (O), (P), (Q) and (R) only:

(ee)  loss resulting directly or indirectly from the fraudulent preparation, or fraudulent modification of **computer programs**, unless covered under Insuring Agreement (L) or (M).

(ff)  loss resulting directly or indirectly from entry or change of **electronic data** or **computer programs** in a **computer system**, unless covered under Insuring Agreement (L) or (M);

(gg)  loss resulting directly or indirectly from the Insured having transferred funds in reliance on the validity of a voice instruction, unless covered under Insuring Agreement (L) or (N);

(hh)  loss resulting directly or indirectly from the Insured having transferred or delivered funds, **certificated securities** or **uncertificated securities** in reliance on an instruction received through a **telefacsimile device**, unless covered under Insuring Agreement (O);

(ii)  loss resulting directly or indirectly from the theft of confidential information;

(jj)  the cost of duplication of **electronic data** or **computer programs** unless covered under Insuring Agreement (P) or (Q);

(kk)  loss involving a **voice computer system**, unless covered under Insuring Agreement (R);

(ll)  loss resulting directly or indirectly from

(1)  written instructions or advices; or

(2)  telegraphic or cable instructions or advices,

unless the instructions or advices are **tested** and the loss is covered under Insuring Agreement (L) or (M);

(mm) loss resulting directly or indirectly from **negotiable instruments**, **certificated securities**, documents or other written instruments which bear a **forged** signature, or are **counterfeit**, altered or otherwise fraudulent and which are used as source documentation in the preparation of **electronic data** or manually keyed into a data terminal;

(nn)  loss resulting directly or indirectly from

(1)  mechanical failure, faulty construction, error in design, latent defect, fire, wear or tear, gradual deterioration, electrical disturbance or electrical surge which affects a **computer system**; or

(2)  failure or breakdown of **electronic data** processing media; or

(3)  error or omission in programming or processing;

(oo)  loss resulting directly or indirectly from the use of a telephone credit, debit, charge, identification or similar card to gain access to the Insured's **voice computer system**;

(pp)  loss resulting directly or indirectly from the input of **electronic data** into a **computer system** terminal device either on the premises of a customer of the Insured or under the control of such a customer by a person who had authorized access to the customer's authentication mechanism.

**DISCOVERY**

Section 3.

This bond applies to loss discovered by the Insured during the Bond Period.  Discovery occurs when a titled officer or risk manager of the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when a titled officer or risk manager of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

Discovery also occurs when a titled officer or risk manager of the Insured becomes aware of facts which would cause a reasonable person to assume that a check kiting fraud has or is occurring against the Insured, even though the exact amount or details of the check kiting fraud may not then be known, or upon notice to a titled officer or risk manager of the Insured by a third party of a possible check kiting fraud, whichever occurs first.

**LIMIT OF LIABILITY**

Section 4.

Aggregate Limit of Liability

The Underwriter's total liability for all losses discovered during the Bond Period shown in Item 2 of the Declarations shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations.  The Aggregate Limit of Liability shall be reduced by the amount of any payment made under the terms of this bond.

Upon exhaustion of the Aggregate Limit of Liability by such payments,

(a)  the Underwriter shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the Underwriter, and

(b)  the Underwriter shall have no obligation under General Agreement F to indemnify the Insured for court costs and attorneys' fees incurred or to continue the defense of the Insured, and upon notice by the Underwriter to the Insured that the Aggregate Limit of Liability has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

The Aggregate Limit of Liability shall not be increased or reinstated by any recovery made and applied in accordance with subsections (a), (b) and (c) of Section 7.  In the event that a loss of **property** is settled by the Underwriter through the use of a lost instrument bond, such loss shall not reduce the Aggregate Limit of Liability.

Single Loss Limit of Liability

Subject to the Aggregate Limit of Liability, the Underwriter's liability for each single loss shall not exceed the applicable Single Loss Limit of Liability shown in the Table of Limits of Liability and Deductible Amounts.  If a single loss is covered under more than one Insuring Agreement or Coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit of Liability.

Single Loss Defined

Single loss means all covered loss, including court costs and attorneys' fees incurred by the Underwriter under General Agreement F, resulting from

(a)  any one act or series of related acts of burglary, robbery or attempt thereat, in which no **employee** is implicated; or

(b)  any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an **employee** or not) resulting in damage to or destruction or misplacement of **property;** or

(c)  all acts or omissions other than those specified in (a) and (b) preceding, caused by any person (whether an **employee** or not) or in which such person is implicated; or

(d)  any one casualty or event not specified in (a), (b) or (c) preceding.

With respect to Insuring Agreement (V), the Underwriter's total liability for all loss arising from one event or related series of events, involving one or more than one **insured person,**  whether involving one or more of the insuring agreements thereunder, is limited to the Single Loss Limit of Liability for Insuring Agreement (V) stated in the Table of Limits of Liability and Deductible Amounts.

**NOTICE / PROOF – LEGAL PROCEEDINGS AGAINST UNDERWRITER**

Section 5.

(a)  At the earliest practicable moment, not to exceed 60 days, after discovery of loss, the Insured shall give the Underwriter notice of any loss of the kind covered by the terms of this bond, whether or not the Underwriter is liable therefor, if the loss is greater than 50% of the applicable Single Loss Deductible amount.

The Insured shall upon request of the Underwriter file with it a brief statement giving the particulars concerning such loss.

(b)  Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

(c)  Lost **certificated securities** listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued therewith.

(d)  Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss.

(c)  This bond affords coverage only in favor of the Insured.  No suit, action or legal proceedings shall be brought hereunder by any one other than the named Insured.

(f)  Proof of loss for claim under Insuring Agreement (O) must include a copy of the document reproduced by the **telefacsimile device**.

(g)  If the Insured is an institution under the supervision of the Office of Thrift Supervision, it is understood and agreed that, in case of any loss hereunder discovered either by the Insured or by the Federal Home Loan Bank of which the Insured is a member, the said Federal Home Loan Bank is empowered to give notice of the loss to the Underwriter within the period limited therefor.

**VALUATION**

Section 6.

Any loss of **money**, or loss payable in **money**, shall be paid, at the option of the Insured, in the **money** of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange at the time of payment of such loss.

**Securities**

The Underwriter shall settle in kind its liability under this bond on account of a loss of any securities or, at the option of the Insured, shall pay to the Insured the cost of replacing such securities, determined at the option of the

Insured by the market value on the business day next preceding the discovery of the loss or the day on which the loss is settled.  In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof. If such securities cannot be replaced or have no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If the applicable coverage of this bond is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the Insured in full for the loss of securities for which claim is made hereunder, the liability of the Underwriter under this bond is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

If there is a loss of securities under this bond, in excess of the applicable Single Loss Deductible amount, for which the Underwriter is required to pay to the Insured the cost of replacing such securities, the Underwriter will also agree to become surety on such bonds replacing securities within the Single Loss Deductible amount without premium charge on the condition that the Insured will indemnify the Underwriter against any loss which the Underwriter may sustain by reason of having become surety on such bonds.  The amount of indemnity under this paragraph shall not exceed the amount stated in the Table of Limits of Liability and Deductible Amounts for the applicable Insuring Agreement.

**Books of Account and Other Records**

In case of loss of, or damage to, any books of account or other records used by the Insured in its business, the Underwriter shall be liable under this bond only if such books or records are actually reproduced and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such books and other records.

**Property other than Money, Securities or Records**

In case of loss of, or damage to, any **property** other than **money**, securities, books of account or other records, or damage covered under Insuring Agreement (B)(2), the Underwriter shall not be liable for more than the cost of replacing such **property**, or of items covered under Insuring Agreement (B)(2).  The Underwriter may, at its election, pay the replacement cost of or repair or replace such **property**.  Disagreement between the Underwriter and the Insured as to the replacement cost or as to the adequacy of repair or replacement shall be resolved by arbitration.

**Customers' Property under Insuring Agreement (T)**

In case of loss of, or damage to, customers' property under Insuring Agreement (T)(2), the Underwriter shall not be liable for more than the actual cash value of the covered property at the time of loss; or what it would cost to repair or replace the covered property with other of like kind and quality; or the applicable Single Loss Limit of Liability stated in the Table of Limits of Liability and Deductible Amounts.  If there is more than one claimant, the recovery for loss shall be prorated

among the claimants in the proportion that the loss sustained by each shall bear to the total loss sustained by all such claimants, unless the Insured shall elect a different order of settlement.

Under Insuring Agreement (T)(2), the Underwriter shall, if possible, settle in kind its liability thereunder on account of loss of **certificated securities** unless the Insured or customer otherwise elects; but the Underwriter may pay for loss of other property or may repair or replace the property, and may settle any claim for loss of property either with the Insured for the account of the customer or with the customer or owner thereof.  Any property so paid for or replaced shall become the property of the Underwriter.

## ASSIGNMENT – SUBROGATION – RECOVERY – COOPERATION

Section 7.

(a)  In the event of payment under this bond, the Insured shall deliver, if so requested by the Underwriter, an assignment of such of the Insured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b)  In the event of payment under this bond, the Underwriter shall be subrogated to all of the Insured's rights of recovery therefor against any person or entity to the extent of such payment.

(c)  Recoveries, whether effected by the Underwriter or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the Insured's loss which would otherwise have been paid but for the fact that it is in excess of either the Aggregate or Single Loss Limit of Liability, secondly, to the Underwriter as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount.  Recovery on account of loss of securities as set forth in the second paragraph of Section 6 or recovery from reinsurance and/or indemnity of the Underwriter shall not be deemed a recovery as used herein.

(d)  Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Insured shall

(1)  submit to examination by the Underwriter and subscribe to the same under oath, and

(2)  produce for the Underwriter's examination all pertinent records, and

(3)  cooperate with the Underwriter in all matters pertaining to the loss.

(e)  The Insured shall execute all papers and render assistance to secure to the Underwriter the rights and causes of action provided for herein.  The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.

## LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE

Section 8.

With respect to any loss set forth in subsection (c) of Section 4 of this bond which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Underwriter to the Insured or to any predecessor in interest of the Insured and terminated or canceled or allowed to expire and in which the period for discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Underwriter under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount be the larger.

If the coverage of this bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an insurer other than the Underwriter and terminated, canceled or allowed to expire, the Underwriter, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under this bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

## OTHER INSURANCE OR INDEMNITY

Section 9.

Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured, or by one other than the Insured on **property** subject to exclusion (p) or by a **transportation company**, or by

another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the **property** involved.

## OWNERSHIP

Section 10.

This bond shall apply to loss of **property** (a) owned by the Insured; (b) held by the Insured in any capacity; or (c) for which the Insured is legally liable. This bond shall be for the sole use and benefit of the Insured named in the Declarations.

## DEDUCTIBLE AMOUNT

Section 11.

The Underwriter shall be liable hereunder only for the amount by which any single loss, as defined in Section 4, exceeds the Single Loss Deductible amount for the Insuring Agreement or Coverage applicable to such loss, subject to the Aggregate Limit of Liability and the applicable Single Loss Limit of Liability.

## TERMINATION OR CANCELLATION

Section 12.

This bond terminates as an entirety upon occurrence of any of the following:  (a) 90 days after the receipt by the Insured of a written notice from the Underwriter of its desire to cancel this bond; or (b) immediately upon the receipt by the Underwriter of a written notice from the Insured of its desire to cancel this bond; or (c) immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials; or (d) immediately upon the taking over of the Insured by another institution; (e) immediately upon exhaustion of the Aggregate Limit of Liability; or (f) immediately upon expiration of the Bond Period as set forth in Item 2 of the Declarations.

This bond terminates as to coverage under Insuring Agreement (K) as to any future act of a customer of the Insured immediately upon discovery by any officer of the Insured of any check kiting by that customer, whether or not the Insured has sustained a loss.

This bond terminates as to any **employee** or any partner, officer or employee of any processor (a) as soon as  any director, titled officer or risk manager of any Insured not in collusion with such person  learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any **property** then in transit in the custody of such person; or (b) 15 days after the receipt by the Insured of a written notice from the Underwriter of its desire to cancel this bond as to such person.

This bond terminates as to any **servicing contractor** (a) immediately upon discovery by any director or officer of any Insured of any dishonest or fraudulent act on the part of such **servicing contractor** unless, within 5 days after discovery of such act, the Insured shall give the Underwriter written notice thereof and in such event this bond shall be deemed terminated as to such **servicing contractor** at the expiration of 30 days after such discovery of such act; or (b) at 12:01 a.m. upon the effective date specified in a written notice served upon the Insured or sent by mail.  Such date, if the notice be served, shall be not less than 30 days after such service, or if sent by mail, not less than 35 days after the date of mailing.

Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

Should this bond be canceled, reduced, nonrenewed or restrictively modified by the Underwriter and the Insured is a seller or servicer of secondary market mortgages of the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation or the Government National Mortgage Association as indicated on the application, the Underwriter will endeavor to give 60 days advance notice to such organizations, but failure to do so shall not impair or delay the effectiveness of any such cancelation, reduction, nonrenewal or restrictive modification, nor shall the Underwriter be held liable in any way.

Should this bond be canceled or reduced at the request of the Insured, the Underwriter will endeavor to notify such organizations of such cancellation or reduction within 10 business days after receipt of such request, but failure to do so shall not impair or delay the effectiveness of such cancellation or reduction, nor shall the Underwriter be held liable in any way.

## RIGHTS AFTER CANCELLATION

Section 13.

The Insured may, at any time prior to the cancellation of this bond as an entirety, whether by the Insured or the Underwriter, give to the Underwriter notice that it desires an additional period of time, not to exceed 12 months, within which to discover loss sustained by the Insured prior to the effective date of such cancellation and shall pay an additional premium therefor. Upon receipt of such notice the Underwriter shall give its written consent thereto; provided, that such additional period of time shall terminate immediately

(a) on the effective date of any insurance obtained by the Insured, its successors in business or any other party, replacing in whole or in part the insurance provided by this bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

(b) upon any takeover of the Insured's business by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed for this purpose,

without the necessity of the Underwriter giving notice of such termination. In the event that such additional period of time is terminated, the Underwriter shall refund any unearned premium.

The right to purchase such additional period for the discovery of loss may not be exercised by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed to take over the Insured's business for the operation or for the liquidation thereof or for any other purpose.

**EMPLOYEE BENEFIT PLANS**

Section 14.

All of the Insured's employee benefit plans that qualify under Section 412 of the Employee Retirement Income Security Act of 1974 (ERISA) are provided bonding protection under Insuring Agreement (A) as required under ERISA.

If this bond, in accordance with the agreements, limitations and conditions thereof, covers loss sustained by two or more employee benefit plans or sustained by any such plan in addition to loss sustained by an Insured other than such plan, it is the obligation of the Insured or the plan administrator(s) of such plans under regulations published by the Secretary of Labor implementing Section 13 of the Welfare and Pension Plans Disclosure Act of 1958 to obtain under one or more bonds issued by one or more insurers an amount of coverage for each such plan at least equal to that which would be required if such plans were bonded separately.

In compliance with the foregoing, payment by the Underwriter in accordance with the agreements, limitations and conditions of the bond shall be held by the Insured, or, if more than one, by the first-named insured, for the use and benefit of any employee benefit plan sustaining loss so covered and to the extent that such payment is in excess of the amount of coverage required by such regulations to be carried by said plan sustaining such loss, such excess shall be held for the use and benefit of any other such plan also covered in the event that such other plan discovers that it has sustained loss covered thereunder.

If **money** or other property of two or more employee benefit plans covered under the bond is commingled, recovery for loss of such **money** or other property through fraudulent or dishonest acts of **employees** shall be shared by such plans on a pro rata basis in accordance with the amount for which each such plan is required to carry bonding coverage in accordance with the applicable provisions of said regulations.

**CONFORMITY**

Section 15.

If any limitation within this bond is prohibited by any law controlling this bond's construction, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

**CHANGE OR MODIFICATION**

Section 16.

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or a change in any part of this bond or stop the Underwriter from asserting any right under the terms and conditions of this bond, nor shall any terms or conditions be waived or changed except by written rider issued to form a part of this bond.

**TITLES OF PARAGRAPHS**

Section 17.

The titles of the various paragraphs of this bond and any riders, if attached to this bond, are inserted solely for convenience or for reference and are not to be deemed in any way to limit or affect the provision to which they relate.

IN WITNESS WHEREOF, the Underwriter has caused this bond to be signed by its President and by its Secretary at Schaumburg, Illinois, and to be countersigned on the Declarations by a duly authorized representative.

Attest                                                         By

*Corporate Secretary*                                         *President*

# Rider/Endorsement Index


**ZURICH**®

| Policy/Bond No. | Eff. Date of Policy/Bond | Exp. Date of Policy/Bond | Eff. Date of Endorsement/Rider | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Policyholder/Name of Insured:**  Midstate Financial Corporation

| Form Name | Form Number | Edition Date | Endorsement No. |
|---|---|---|---|
| Disclosure Statement | U-GU-873-A CW | 6/1/2011 | |
| Notice of Disclosure For Agent & Broker Compensation | U-GU-874-A CW | 6/1/2011 | |
| Important Notice – In Witness Clause | U-GU-319-F | 1/1/2009 | |
| Declarations | U-FIB-D-0005-A CW | 1/1/2001 | |
| Table of Limits of Liability and Deductible Amounts-Aggregate | U-FIB-D-0006-A CW | 1/1/2001 | |
| Schedule A | U-FIB-1026-A CW | 1/1/2001 | |
| Financial Institution Select Bond | U-FIB-0004-A CW | 1/1/2001 | |
| Knowledge of Prior Dishonesty Rider | U-FIB-1040-A CW | 11/1/2005 | 1 |
| Sanctions Exclusion Endorsement | U-GU-1191-A CW | 3/1/2015 | 2 |
| Safe Deposit Box Single Limit Rider | U-FIB-1015-B CW | 1/1/2001 | 3 |
| Debit Card Rider | U-FIB-1028-A CW | 1/1/2001 | 4 |
| Annual Aggregate Rider | U-FIB-1033-A CW | 1/1/2001 | 5 |
| Negotiable Instrument Amended | U-FIB-1059-A CW | 10/1/2008 | 6 |

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Includes copyrighted material of Surety & Fidelity Association of America, with its permission.

**Rider #1**



# Knowledge of Prior Dishonesty Rider

| Bond No. | Eff. Date of Bond | Exp. Date of Bond | Eff. Date of Rider | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Name of Insured:**  Midstate Financial Corporation

**THIS RIDER CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This rider modifies insurance provided under the:

Financial Institution Select Bond

It is agreed that:

The following is added to Section 2.  **EXCLUSIONS**:

This bond does not cover

loss resulting directly or indirectly from the dishonest or fraudulent acts of an **employee** if any Insured, or any director or officer of an Insured who is not in collusion with such person, knows, or knew at any time, of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity and without regard to whether the knowledge was obtained before or after the commencement of this bond.  Provided, however, that this exclusion does not apply to loss of any **property** already in transit in the custody of such person at the time such knowledge was obtained or to loss resulting directly from dishonest or fraudulent acts occurring prior to the time such knowledge was obtained.

**ALL OTHER TERMS AND CONDITIONS OF THE BOND SHALL APPLY AND REMAIN UNCHANGED.**

Includes copyrighted material of Surety and Fidelity Association of America, with its permission.

**Rider #2**



# Sanctions Exclusion Endorsement

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Policyholder:** Midstate Financial Corporation

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

Financial Institution Select Bond

It is agreed that:

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided. Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Includes copyrighted material of Surety & Fidelity Association of America, with its permission.

**Rider #3**



# Safe Deposit Box Single Limit Rider

| Bond No. | Eff. Date of Bond | Exp. Date of Bond | Eff. Date of Rider | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Name of Insured:**  Midstate Financial Corporation

**THIS RIDER CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This rider modifies insurance provided under the:

Financial Institution Select Bond

It is agreed that:

The Table of Limits of Liability and Deductible Amounts is amended by replacing Insuring Agreement (T) with the following:

(T)  SAFE DEPOSIT BOX

       TOTAL LIMIT OF LIABILITY FOR INSURING AGREEMENTS (T)(1) and (T)(2)        $500,000

          (T)(2) LOSS OF CUSTOMERS' PROPERTY      includes MONEY ☒     excludes MONEY ☐

**ALL OTHER TERMS AND CONDITIONS OF THE BOND SHALL APPLY AND REMAIN UNCHANGED.**

Includes copyrighted material of Surety and Fidelity Association of America, with its permission.

**Rider #4**



# Debit Card Rider

| Bond No. | Eff. Date of Bond | Exp. Date of Bond | Eff. Date of Rider | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Name of Insured:**  Midstate Financial Corporation

**THIS RIDER CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This rider modifies insurance provided under the:

Financial Institution Select Bond

It is agreed that:

1. An additional Insuring Agreement is added as follows:

DEBIT CARD

Loss resulting directly from the fraudulent use of a debit card to obtain cash or pay for products or services by gaining access to an electronic payment device provided that such device electronically verifies the customer's available funds in the customer's depository account at the Insured as part of the transaction.

2. As respects the DEBIT CARD INSURING AGREEMENT:

   (a) Debit card means a card issued or which purports to have been issued by or on behalf of the Insured which is used at electronic payment devices to obtain cash or pay for products or services by debiting the customer's depository account at the Insured.  Debit card does not mean the use of only the account number without the actual physical possession of the debit card.

   (b) Electronic payment device means an electronic device, other than a telephone or a computer through which a customer may initiate an electronic funds transfer.  Electronic payment devices shall include, but not be limited to, point of sale terminals, **automated teller machines**, and cash dispensing machines.

3. Item (k) of Section 2. EXCLUSIONS is deleted in its entirety and replaced by the following:

   (k) loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards

      (1) in obtaining credit or funds, or

      (2) in gaining access to automated mechanical devices which, on behalf of the Insured, disburse **money**, accept deposits, cash checks, drafts or similar written instruments or make credit card **loans**, or

      (3) in gaining access to point of sale terminals, customer-bank communication terminals, or similar electronic terminals of electronic funds transfer systems,

   whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under INSURING AGREEMENT (A) or the DEBIT CARD INSURING AGREEMENT;

4. The following exclusion is applicable to the DEBIT CARD INSURING AGREEMENT:

   Loss resulting from the use of any debit card outside the United States of America, the District of Columbia, Virgin Islands, Puerto Rico and Canada.

Includes copyrighted material of Surety and Fidelity Association of America, with its permission.

5.  The Single Loss Limit of Liability and Single Loss Deductible for the DEBIT CARD INSURING AGREEMENT are the amounts shown on the Table of Limits of Liability and Deductible Amounts, or amendment thereto.

**ALL OTHER TERMS AND CONDITIONS OF THE BOND SHALL APPLY AND REMAIN UNCHANGED.**

Includes copyrighted material of Surety and Fidelity Association of America, with its permission.

Rider #5

# Annual Aggregate Rider



| Bond No. | Eff. Date of Bond | Exp. Date of Bond | Eff. Date of Rider | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Name of Insured:**  Midstate Financial Corporation

**THIS RIDER CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This rider modifies insurance provided under the:

Financial Institution Select Bond

It is agreed that:

1. Item 3. of the Declarations is deleted in its entirety and substituted in lieu thereof is the following:

    Item 3. The Aggregate Liability for each **bond year** during the Bond Period shall be $8,000,000

2. The following definition is added to Section 1. **DEFINITIONS** of the Conditions and Limitations:

    **Bond year** means the period of one year following either the effective date of the Bond Period or any anniversary thereof, or if the time between the effective date or anniversary and the termination of this bond is less than one year, such lesser period.

3. The first and second paragraphs of Section 4. **LIMIT OF LIABILITY** are deleted and substituted in lieu thereof are the following:

    **AGGREGATE LIMIT OF LIABILITY**

    The Underwriter's total liability for all losses discovered during each **bond year** of the Bond Period shown in Item 2 of the Declarations shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations.  The Aggregate Limit of Liability shall be reduced by the amount of any payment made under the terms of this bond.

    Upon exhaustion of the Aggregate Limit of Liability by such payments,

    (a) the Underwriter shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the Underwriter, and

    (b) the Underwriter shall have no obligation under General Agreement F to indemnify the Insured for court costs and attorneys' fees incurred or to continue the defense of the Insured, and upon notice by the Underwriter to the Insured that the Aggregate Limit of Liability has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

4. Item (e) of the first paragraph of Section 12 **TERMINATION OR CANCELLATION** is deleted and substituted in lieu thereof is the following"

    (e) immediately upon exhaustion of the Aggregate Limit of Liability for the final **bond year** of the Bond Period; or

**ALL OTHER TERMS AND CONDITIONS OF THE BOND SHALL APPLY AND REMAIN UNCHANGED.**

Includes copyrighted material of Surety and Fidelity Association of America, with its permission.

**Rider #6**



# Negotiable Instrument Amended Rider

| Bond No. | Eff. Date of Bond | Exp. Date of Bond | Eff. Date of Rider | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| FIB 0002690 12 | 1/1/2018 | 1/1/2021 | 1/1/2018 | ---- | ---- |

**Name of Insured:**  Midstate Financial Corporation

**THIS RIDER CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This rider modifies insurance provided under the:

Financial Institution Select Bond

It is agreed that:

Item (w) of Section 1. DEFINITIONS is deleted and replaced by the following:

**(w) Negotiable instrument** means any writing

    (1)  signed by the maker or drawer, and

    (2)  containing any unconditional promise to pay a sum certain in **money** and no other promise, order, obligation or power given by the maker or drawer, and

    (3)  is payable on demand or at a definite time, and

    (4)  is payable to order or bearer.

**Negotiable instrument** includes a substitute check as defined in the Check Clearing for the 21st Century Act, and shall be treated the same as the original it replaced.

**ALL OTHER TERMS AND CONDITIONS OF THE BOND SHALL APPLY AND REMAIN UNCHANGED.**

Includes copyrighted material of Surety and Fidelity Association of America, with its permission.

Case 1:21-cv-00430-TWP-DLP Document 1-2 Filed 02/24/21 Page 57 of 66 PageID #: 64

32D02-2012-PL-000169

Filed: 12/28/2020 3:55 PM
Clerk
Hendricks County, Indiana

Hendricks Superior Court 2

STATE OF INDIANA      )
                    ) SS:
COUNTY OF HENDRICKS )

IN THE HENDRICKS _____ COURT

CAUSE NO. _____

MIDSTATE FINANCIAL CORPORATION and  )
HENDRICKS COUNTY BANK AND TRUST    )
COMPANY,                                )
                                    )
             Plaintiffs,             )
                                    )
    v.                                  )
                                    )
FIDELITY AND DEPOSIT COMPANY      )
OF MARYLAND,                    )
                                    )
            Defendant.            )

## SUMMONS

**TO DEFENDANT:**    Fidelity and Deposit Company of Maryland
                        4 World Trade Center, 54th Floor
                        150 Greenwich Street
                        New York, NY 10007

     You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

     The nature of the suit against you is stated in the complaint, which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

     An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by the plaintiff.

     If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated   _12/28/2020_____          _Debbie Hoskins_____(Seal)
                                      CLERK, HENDRICKS COUNTY COURT

**(The following manner of service of summons is hereby designated.)**

    **X**_____    Registered or certified mail.

_____    Service at place of employment, to-wit:

_____    Service on individual – (Personal or copy) at above address.

_____    Service on agent. (Specify) _____

_____    Other service. (Specify) _____

/s/  Nicholas B. Reuhs
Nicholas B. Reuhs, Attorney No. 31181-49
Samuel B. Gardner, Attorney No. 32825-29
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100

Attorneys for Plaintiffs

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____ 2020:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant,

_____
.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:  _____

_____

_____          _____
            SHERIFF'S COST                                    SHERIFF

By:_____
                                              DEPUTY

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____day of _____, 2020, I mailed a copy of this
Summons and a copy of the complaint to the defendant, _____,
by _____mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
CLERK, HENDRICKS COUNTY COURT

Dated_____          By:_____
                                                          DEPUTY

## <u>RETURN ON SERVICE OF SUMMONS BY MAIL</u>

      I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____was accepted by the defendant on the _____day of _____, 2020.

      I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____day of _____, 2020.

      I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____was accepted by _____on behalf of said defendant on the _____ day of _____, 2020.

 

_____

CLERK, HENDRICKS COUNTY COURT

Dated_____      By:_____

                                                                   DEPUTY

STATE OF INDIANA          )          IN THE HENDRICKS _____ COURT
                          ) SS:
COUNTY OF HENDRICKS )                CAUSE NO. _____

MIDSTATE FINANCIAL CORPORATION and    )
HENDRICKS COUNTY BANK AND TRUST        )
COMPANY,                               )
                                       )
                Plaintiffs,            )
                                       )
        v.                             )
                                       )
FIDELITY AND DEPOSIT COMPANY           )
OF MARYLAND,                           )
                                       )
                Defendant.             )

## SUMMONS

**TO DEFENDANT:**    Fidelity and Deposit Company of Maryland
                     c/o Registered Agent, CSC-Lawyers Incorporating Service Company
                     7 St. Paul Street, Suite 820
                     Baltimore, MD  21202

        You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

        The nature of the suit against you is stated in the complaint, which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

        An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by the plaintiff.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated ____12/28/2020_____          _____Debbie Hoskins_____(Seal)
                                              CLERK, HENDRICKS COUNTY COURT

**(The following manner of service of summons is hereby designated.)**

____X_____    Registered or certified mail.

_____    Service at place of employment, to-wit:

_____    Service on individual – (Personal or copy) at above address.

_____    Service on agent. (Specify) _____

_____    Other service. (Specify) _____

/s/  Nicholas B. Reuhs
Nicholas B. Reuhs, Attorney No. 31181-49
Samuel B. Gardner, Attorney No. 32825-29
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100

Attorneys for Plaintiffs

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____ 2020:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant,

_____
.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks: _____

_____

| | |
|---|---|
| _____ | _____ |
| SHERIFF'S COST | SHERIFF |

By:_____
DEPUTY

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____day of _____, 2020, I mailed a copy of this
Summons and a copy of the complaint to the defendant, _____,
by _____mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
CLERK, HENDRICKS COUNTY COURT

Dated_____          By:_____
DEPUTY

2

## <u>RETURN ON SERVICE OF SUMMONS BY MAIL</u>

  I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____was accepted by the defendant on the _____day of _____, 2020.

  I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2020.

  I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____was accepted by _____on behalf of said defendant on the _____ day of _____, 2020.

        _____
        CLERK, HENDRICKS COUNTY COURT

Dated_____   By:_____
                  DEPUTY

I\15863804.1

Filed: 2/22/2021 4:05 PM
Clerk
Hendricks County, Indiana

STATE OF INDIANA      )             IN THE HENDRICKS SUPERIOR COURT
                       ) SS:
COUNTY OF HENDRICKS )        CAUSE NO. 32D02-2012-PL-000169

MIDSTATE FINANCIAL CORPORATION and   )
HENDRICKS COUNTY BANK AND TRUST   )
COMPANY,                              )
                                  )
          Plaintiffs,            )
                                  )
   v.                            )
                                  )
FIDELITY AND DEPOSIT COMPANY      )
OF MARYLAND,                     )
                                  )
          Defendant.           )

## **TENDER OF PROOF OF SERVICE**

Plaintiffs Midstate Financial Corporation and Hendricks County Bank and Trust Company (collectively, "Hendricks County Bank"), by counsel, tender herewith proof of service (attached as ***Exhibit 1***) confirming service of the following pleadings on Defendant on February 10, 2021:

1. Appearance of Nicholas B. Reuhs and Samuel B. Gardner on behalf of Plaintiffs;

2. Plaintiffs' Complaint for Declaratory Relief and Bad Faith; and

3. Summons (to Fidelity and Deposit Company of Maryland).

Respectfully submitted,

/s/ Nicholas B. Reuhs
Nicholas B. Reuhs, Attorney No. 31181-49
Samuel B. Gardner, Attorney No. 32825-29
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100

Nicholas.Reuhs@icemiller.com
Samuel.Gardner@icemiller.com

Attorneys for Plaintiffs
Midstate Financial Corporation and Hendricks
County Bank and Trust Company

I\16011419.1

# EXHIBIT 1

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece.

Fidelity and Deposit Company of Maryland
c/o Registered Agent, CSC-Lawyers
    Incorporating Service Company
7 St. Paul Street, Suite 820
Baltimore, MD 21202

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                             ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                 FEB 1 0 2021

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

9590 9402 5775 0003 6597 00

2. Article Number (Transfer from service label)
7020 0640 0000 7251 2260

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ ____ Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                Domestic Return Receipt